RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0159p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————

CARRIE BRAUN,

> *Plaintiff-Appellee/Cross-Appellant* (13-4145 & 14-3816),
>
> *Plaintiff-Appellee* (15-3462),

> Nos. 13-4145/ 14-3816/ 15-3462

*v.*

ULTIMATE JETCHARTERS, LLC,

> *Defendant-Appellant/Cross-Appellee* (13-4145 & 14-3816),
>
> *Defendant-Appellant* (15-3462).

—————————

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:12-cv-01635—Sara E. Lioi, District Judge.

Argued: April 22, 2016

Decided and Filed: July 8, 2016

Before: DAUGHTREY, CLAY, and STRANCH Circuit Judges.

—————————

**COUNSEL**

**ARGUED:** Sidney N. Freeman, MCNAMARA, DEMCZYK CO., L.P.A., Uniontown, Ohio, for Appellant/Cross-Appellee Jetcharters. Donald C. LeRoy, Hamilton, Ohio, for Appellee/Cross-Appellant Braun. **ON BRIEF:** Sidney N. Freeman, MCNAMARA, DEMCZYK CO., L.P.A., Uniontown, Ohio, for Appellant/Cross-Appellee Jetcharters. Donald C. LeRoy, Hamilton, Ohio, for Appellee/Cross-Appellant Braun.

---

**OPINION**

---

CLAY, Circuit Judge.   Defendant Ultimate Jetcharters, LLC, sometimes referred to in this litigation as Ultimate Jetcharters, Inc. ("UJC"), appeals from the judgment in favor of Plaintiff Carrie Braun ("Plaintiff") on her claim for retaliatory discharge in violation of Ohio Rev. Code § 4112.02(I).   Pursuant to a jury verdict in Plaintiff's favor, the district court entered an initial judgment awarding her compensatory and punitive damages.   The court later granted in part and denied in part Plaintiff's motion for attorney fees, and thereafter entered final judgment incorporating such fees.   That final judgment is the subject of UJC's appeal No. 13-4145 and Plaintiff's cross-appeal No. 14-3816.   The district court later granted Plaintiff's Rule 60(a) motion to correct the judgment to reflect that Ultimate Jetcharters, LLC is UJC's correct moniker.   UJC's appeal No. 15-3462 is taken from that amended judgment.   For the reasons set forth below, we **AFFIRM** the district court's judgment in full.

**BACKGROUND**

UJC is a corporation that provides private jet charter services, flying cargo and passengers to destinations across the United States and internationally.   In April 2011, UJC hired Plaintiff, who is female, to work as a co-pilot.   Robert "Bob" Rossi ("Rossi") and Floyd "Burt" Wells ("Wells") were two male pilots that also worked at UJC.   After multiple altercations between Plaintiff, Rossi, and Wells, which Plaintiff perceived to constitute sexual harassment, Plaintiff made several phone calls and eventually wrote an email to UJC management complaining about her coworkers' conduct.   On March 12, 2012—roughly three weeks after she sent the email—Plaintiff's employment with UJC was terminated.

Plaintiff subsequently filed suit against Ultimate Jetcharters, Inc., Rossi, and Wells (collectively "Defendants") in federal court, alleging, *inter alia*, that she was terminated in retaliation for her complaints.   Defendants filed an answer offering a general denial of the allegations.   Notably, Defendants' answer "admit[ted] that UJC was initially a corporation as alleged in paragraph #3 [of Plaintiff's complaint], but was converted to a limited liability

company on September 28, 2010." (R. 4, PageID 40.)  Plaintiff did not amend her complaint in response, and Defendants' subsequent dispositive motions failed to press the issue of UJC's proper moniker or corporate form.  Defendants' motions, however, proved successful at narrowing Plaintiff's case to a single cause of action against UJC for retaliation under Ohio's Title VII analogue, Ohio Rev. Code § 4112.02(I).[1]

On August 19, 2013, Plaintiff's case proceeded to trial on that remaining claim.  Plaintiff served as the sole witness in support of her case.  She testified that Rossi and Wells, with whom she worked on a regular basis, continually "harassed" her about her marital status, her uniform, and her off-duty behavior; she described several instances of the purported harassment in detail.  Plaintiff testified that she reported the harassment to UJC's director of operations, Dave Parsons ("Parsons"), in four phone calls made over the course of her employment.  In all of these calls, Plaintiff conveyed her belief that Rossi and Wells were harassing her because she was female.  After the fourth report, Parsons instructed Plaintiff to put her concerns in writing.  Thus, on February 20, 2012, Plaintiff sent an email to both Rossi, with whom she had had her most recent altercation, and Parsons.  The subject line of the email was "Cease and desist!" (R. 44-3, PageID 415.)  In the body of the email, Plaintiff asserted that both Rossi's and Wells' behavior was "bordering on harassment" and that she did not "want . . . the situation to escalate as it has been doing to full fledged harassment." (*Id.*)

On March 12, 2012—roughly three weeks after sending her email—Plaintiff received a phone call from John Gordon ("Gordon"), UJC's president and CEO, who informed Plaintiff that her employment was being terminated.  Plaintiff testified that Gordon provided two reasons for her termination during this conversation: that Plaintiff had sent "[i]nappropriate e-mails," and that Plaintiff's "[c]onduct while on the road . . . while not performing job functions was not in line with [UJC's] image." (R. 120, PageID at 1666–67.)  According to Plaintiff, Gordon refused to clarify to which emails or what conduct he was referring.

---

[1]On appeal, UJC argues that the district court erred by denying its motion for summary judgment as to this claim.  We do not address that argument, however, because "a losing party may not 'appeal an order denying summary judgment after a full trial on the merits.'" *Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 549–50 (6th Cir. 2015) (quoting *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011)).

At the close of Plaintiff's case in chief, UJC made an oral motion for judgment as a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50(a). In so doing, UJC's counsel stated: "The reason for [JMOL] is very specific. The evidence shows that no complaint about sexual harassment or about discrimination was made by Ms. Braun." (R. 121, PageID 1782.) The subsequent colloquy focused on whether Plaintiff had engaged in protected activity necessary for establishing a retaliation claim by submitting a legally sufficient "complaint" to UJC management, and whether Plaintiff's email to Rossi and Parsons satisfied that requirement. The district court ultimately denied UJC's motion, and the trial continued with UJC's defense.

UJC proffered the testimony of some fourteen witnesses. As relevant here, Gordon testified that Plaintiff's termination had nothing to do with her complaints of harassment; rather, she was terminated because of her performance on the job. As examples of Plaintiff's performance issues, Gordon stated that he had received reports that Plaintiff had violated the "sterile cockpit rule" by using her cell phone while piloting an aircraft below 10,000 feet; that on one occasion, Plaintiff became intoxicated and danced inappropriately at a bar while spending the night in Atlantic City as part of her shift; that Plaintiff had once dangerously performed a turning maneuver while piloting an aircraft that she had leveled off at an altitude of 400 feet; and that Plaintiff had a habit of unnecessarily executing so-called "steep attitude" or "max performance" climbs, which involve climbing steeply after takeoff. Gordon admitted on cross examination that he had been informed of Plaintiff's verbal complaints of "harassment" by Rossi and Wells, but that he did not think their behavior constituted harassment. Parsons also testified at the trial, stating, *inter alia*, that he "[a]bsolutely" provided input on the decision to terminate Plaintiff. (R. 121, PageID 1873.)

Plaintiff was recalled to provide rebuttal testimony, during which she denied any inappropriate conduct or provided explanations for the purportedly inappropriate conduct that allegedly motivated her termination. The jury also heard testimony, including by admission on cross examination of UJC's own witnesses, that UJC's male pilots often engaged in some of the same behavior, such as violating the "sterile cockpit rule," that allegedly motivated Plaintiff's termination. Before the case was submitted to the jury, UJC again moved for JMOL. UJC's counsel provided no additional support for that motion, but stated that UJC was renewing solely

for the purpose of "protect[ing] the record." (R. 123, PageID 2490–91.) The district court once again denied the motion.

On August 26, 2013, the jury returned a verdict in favor of Plaintiff, awarding her $70,250.00 in compensatory damages and $100,000.00 in punitive damages. Plaintiff thereafter filed a motion for attorney's fees; UJC filed a motion for remittitur of punitive damages and a Rule 50(b) renewed motion for JMOL or for a new trial. *See* Fed. R. Civ. P. 50(b) (allowing a renewed motion for JMOL to "include an alternative or joint request for a new trial under Rule 59"). On July 30, 2014, the district court issued an order and opinion denying UJC's motion for JMOL or a new trial, denying UJC's motion for remittitur, and granting in part Plaintiff's motion for attorney's fees. Both Plaintiff and UJC timely appealed.[2]

When Plaintiff later attempted to collect on her judgment against Ultimate Jetcharters, Inc., she received a letter from UJC's counsel stating, in pertinent part:

> The company you sued is Ultimate Jetcharters, Inc. Ultimate Jetcharters, Inc. was closed and is out of business without assets. It was the operating company owned by investors from whom Ultimate Jet, LLC, (the holding company which owns Ultimate Jetcharters, LLC) purchased the assets of Ultimate Jetcharters, Inc. several years ago. Irrespective of the fact that Ultimate Jetcharters, Inc., the Defendant in your action, has no assets, Mr. Gordon, on behalf of Ultimate Jetcharters, LLC, wants to continue to attempt to resolve the issues and settle this matter. . . . To that end, Mr. Gordon has authorized me to re-extend the offer made in mediation of [$125,000.00] . . . .

(R. 171-1, PageID 3033.) As the district court later summarized, "[i]t seemed . . . that plaintiff had never been employed by Ultimate Jetcharters, Inc., but, instead, had been employed by Ultimate Jetcharters, LLC." (R. 185, PageID 3192.) Plaintiff thereafter filed a motion to correct the judgment pursuant to Federal Rule of Civil Procedure 60(a).

On March 31, 2015, the district court granted Plaintiff's motion and entered a new final judgment listing Ultimate Jetcharters, LLC as the defendant. In its order, the district court held

---

[2]Plaintiffs' briefing on appeal explicitly declines to provide any developed argument regarding the district court's reduction in her requested attorney fees. (*See* Pl.'s Br. at 30–31 ("[T]his assignment of error will not be addressed by the undersigned beyond the statement above regarding the applicable standard of review.").) We therefore conclude that Plaintiff has waived this issue. *See* Fed. R. App. P. 28(a)(8); *Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir. 1995) ("We consider issues not fully developed and argued to be waived.").

that the prosecution of the case against "Ultimate Jetcharters, Inc." rather than "Ultimate Jetcharters, LLC" amounted to a clerical error.  In support of this conclusion, the district court noted that UJC's own filings and witnesses substantially added to any confusion regarding UJC's corporate form, and that the LLC's counsel and CEO defended the lawsuit against Ultimate Jetcharters, Inc. as though the LLC were the real party in interest.  The court concluded: "Under these circumstances, to permit Ultimate Jetcharters, Inc. to roll the dice at trial and then hide behind a change in corporate structure when it comes time to collect on the judgment would make a mockery of the Court's proceedings."  (R. 185, PageID  3201.)

In response to the newly-entered final judgment listing Ultimate Jetcharters, LLC as the defendant, UJC timely filed an amended notice of appeal.

## DISCUSSION

### I.     UJC's Renewed Motion for Judgment as a Matter of Law or a New Trial

#### Preservation of the Issues

In its renewed motion for JMOL or a new trial, UJC made many of the same arguments that it now makes on appeal—namely, that Plaintiff's evidence at trial was legally insufficient to establish three of the four elements of her prima facie case of retaliation, and that she similarly failed to demonstrate that UJC's nondiscriminatory reasons for her termination were pretextual. We note, however, that it is unlikely that many of these sufficiency arguments were properly preserved by UJC's pre-verdict motions for JMOL.[3]  This discrepancy is relevant due to "the well-established proposition that a post-trial motion for judgment as a matter of law 'is not available at anyone's request on an issue not brought before the court prior to submission of the case to the jury.'" *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 491 (6th Cir. 2008) (quoting *Am. & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997)); *see also Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 426 (6th Cir. 1993) ("A party who has failed to move for a

---

[3]Determining which arguments were properly preserved would require further analysis of the "specific grounds" for UJC's oral motions.  *See Kusens v. Pascal Co.*, 448 F.3d 349, 361 (6th Cir. 2006) (noting that "Rule 50(a) requires a motion for judgment as a matter of law to state the 'specific grounds'" upon which it is based).

directed verdict cannot request the district court to rule on the sufficiency of the evidence supporting a verdict against him nor can he raise this issue on appeal.").

Below, the district court opined that analysis of Rule 50's waiver principle in this case would be an "academic" exercise. This is so, the district court reasoned, because UJC's sufficiency arguments would necessarily be resolved in the context of its Rule 59 motion for a new trial. *Cf. Park W. Galleries, Inc. v. Hochman*, 692 F.3d 539, 544 (6th Cir. 2012) (observing that "the governing principle in the district court's consideration of a motion for a new trial is whether . . . such course is required in order to prevent an injustice" (internal quotation marks omitted)). We have cautioned, however, that motions for a new trial should not be used as a loophole for presenting sufficiency arguments that were not properly preserved by a pre-verdict motion for JMOL. *See U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp., Inc.*, 400 F.3d 428, 450 n.17 (6th Cir. 2005); *S. Ry. Co. v. Miller*, 285 F.2d 202, 206 (6th Cir. 1960) ("No motion for directed verdict having been made, the question of the sufficiency of the evidence to support the jury's verdict is not available as a ground for a motion for new trial."). *But see Portage II v. Bryant Petroleum Corp.*, 899 F.2d 1514, 1523 (6th Cir. 1990) ("If the evidence was insufficient as a matter of law . . . the court can order a new trial." (quoting *Rymer v. Davis*, 754 F.2d 198, 199–200 (6th Cir. 1985))); 9B Wright et al., *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 2539 (3d ed. 2016) ("[T]he evidence may be wholly insufficient to support the verdict but the trial court cannot order judgment as a matter of law under Rule 50(b) [due to a procedural blunder]. In those circumstances the district court, on proper motion, has the authority to order a new trial.").

Nevertheless, because the parties failed to brief these issues, and because we conclude that UJC's sufficiency arguments fail on the merits in any event, we join the district court in declining to address whether UJC's sufficiency arguments were waived.[4]

---

[4]We reiterate, however, that Rule 50 is not a vehicle for presenting legal arguments developed only after an unfavorable jury verdict; nor, for that matter, is the Rule intended to permit defendants to hold unlitigated legal arguments in reserve as get-out-of-verdict-free cards. *See Ford*, 535 F.3d at 491–92. A similar policy undergirds our holding in *Southern Railway Co.*, 285 F.2d at 206: careless (or unscrupulous) parties ought not to be granted multiple opportunities to roll the dice with a jury.

**Standard of Review**

We review *de novo* the district court's denial of UJC's motion for JMOL made pursuant to Federal Rule of Civil Procedure 50(b). *Rhinehimer v. U.S. Bancorp Invs., Inc.*, 787 F.3d 797, 804 (6th Cir. 2015). "In so doing, we may not weigh the evidence, question the credibility of witnesses, or substitute our own judgment for that of the jury." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016).

> [W]e may grant such a motion only when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party.

*Id.* (internal quotation marks omitted). The district court's denial of UJC's motion for a new trial, which argued that the verdict was against the weight of the evidence, is reviewed for abuse of discretion. *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). "We simply review the evidence and the district court's ruling, and we reverse only if we have 'a definite and firm conviction' that the district court committed 'a clear error of judgment'" by declining to order a new trial. *Id.* at 617 (quoting *United States v. Kuehne*, 547 F.3d 667, 692 (6th Cir. 2008)); *see also Armisted v. State Farm Mut. Auto. Ins. Co.*, 675 F.3d 989, 994–95 (6th Cir. 2012). For UJC to succeed on either of its motions, it "must overcome the substantial deference owed a jury verdict." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007).

**Analysis**

Ohio Revised Code § 4112.02(I) prohibits "any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section . . . ." This language mirrors that of Title VII, which establishes civil penalties under federal law for any employer that "discriminate[s] against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a). Because of these statutes' similar language and origin, Ohio courts have held that "[f]ederal law provides the applicable analysis for reviewing retaliation claims" brought under Ohio Rev. Code § 4112.02(I). *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App. 1998); *see also Plumbers & Steamfitters Joint*

*Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of [Ohio Rev. Code] Chapter 4112.").

Under federal and Ohio law, an employee attempting to prove unlawful retaliation must first establish a prima facie case.  *See generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981); *see also Plumbers & Steamfitters*, 421 N.E.2d at 131 (applying the *McDonnell Douglas*/*Burdine* burden-shifting framework to a claim of employment discrimination brought under Ohio Rev. Code Chapter 4112).    Establishing a prima facie case of retaliation requires the employee to demonstrate:

(1) . . . he engaged in a protected labor activity under Ohio or federal law,

(2) . . . his engagement in protected activities was known to the defendant,

(3) defendant took an employment action adverse to plaintiff . . . , and

(4) there was a causal connection between the protected activity and the adverse employment action.

*Baker*, 713 N.E.2d at 491 (citing *Rudy v. Loral Def. Sys.*, 619 N.E.2d 449, 454 (Ohio Ct. App. 1993)); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) ("The burden of establishing a *prima facie* case in a retaliation action is not onerous, but one easily met.").[5]

"Establishment of the prima facie case in effect creates a presumption" that the employer retaliated against the employee. *Burdine*, 450 U.S. at 254.  "If Plaintiff establishes a prima facie case . . . then the burden shifts to Defendants to articulate a legitimate, [nonretaliatory] reason for Plaintiff's discharge." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000).  Upon production of such a reason, "Plaintiff must . . . demonstrate that the proffered reason was not the true reason for the employment action—i.e., that the reason was a mere pretext for" retaliation. *Id.* at 578–79.

**A.    Protected activity**

---

[5]The parties do not dispute that Plaintiff's termination constitutes an adverse employment action, thereby establishing the third element of a prima facie case.

Both Title VII and Ohio Rev. Code § 4112.02(I) contain a so-called opposition clause, under which employers may not retaliate against any employee that "opposed" an unlawful practice. *See* Ohio Rev. Code Ann. § 4112.02(I); 42 U.S.C. § 2000e-3(a). Such opposing conduct constitutes a protected activity for the purposes of establishing the first element of a prima facie case of retaliation. *See Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 469 (6th Cir. 2012).

> The Equal Employment Opportunity Commission . . . has identified a number of examples of 'opposing' conduct which is protected by Title VII, including complaining to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices . . . and opposing unlawful acts by persons other than the employer—e.g., former employers, union, and coworkers.

*Johnson*, 215 F.3d at 579. Importantly, "[a] person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful." *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312–13 (6th Cir. 1989).

As UJC notes, however, "a vague charge of discrimination . . . is insufficient to constitute opposition to an unlawful employment practice." *Id.* at 1313; *see also Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 592 (6th Cir. 2007) (holding the plaintiff's actions did not constitute a legally sufficient complaint where "the record [did] not contain any evidence that [the plaintiff] specifically alleged discriminatory employment practices in his discussion with [a manager]"); *Balding-Margolis v. Cleveland Arcade*, 352 F. App'x 35, 45 (6th Cir. 2009) (holding same where the plaintiff's multiple complaints to management did not indicate that she "was objecting to discriminatory conduct against her based on her membership in a protected class"); *Willoughby v. Allstate Ins. Co.*, 104 F. App'x 528, 530–31 (6th Cir. 2004) (holding same where the plaintiff's letter to management made only vague references to unhappiness among Caucasian employees). Still, these holdings do not "require that the plaintiff's complaint be lodged with absolute formality, clarity, or precision." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015) (internal quotation marks omitted).

Based on the above authority, UJC asserts that Plaintiff's multiple complaints to Parsons, as well as her email to Rossi and Parsons, were too vague to constitute a legally sufficient

complaint to management. We disagree. At trial, Plaintiff testified that during each of the four calls she made to Parsons, she explicitly relayed her belief that she was being mistreated by Rossi and Wells because she was female. Indeed, Plaintiff testified that in the last of these calls, she told Parsons: "This is discrimination. This is harassment. [Rossi and Wells] are only doing this because they do not like to fly with women." (R. 120, PageID 1661.) These phone calls were followed by Plaintiff's "Cease and desist!" email, in which she twice indicated that she believed Rossi's and Wells' conduct was nearing "harassment." (R. 44-3, PageID 415.) Taken together, Plaintiff's phone calls and email provided more than sufficient evidence of a legally valid complaint of unlawful conduct. Stated differently, the evidence presented at trial sufficiently established that UJC should "have reasonably understood that [Plaintiff] was making a complaint of [sex] discrimination in exercise of her rights under O.R.C. § 4112.02." *Kiehl v. Univ. Hosp. Health Sys.-Heather Hill, Inc.*, No. 1:08 CV 763, 2009 WL 1586326, at *7 (N.D. Ohio June 4, 2009).

UJC argues that under *Osaze v. City of Strongsville*, No. 86474, 2006 WL 562186 (Ohio Ct. App. 2006), Plaintiff's complaints about her coworkers could not, as a matter of law, constitute valid complaints regarding unlawful activity. *See id.* at *4 (affirming dismissal of the plaintiff's retaliation claim where he had "only complained about discriminatory conduct by his coworkers," rather than his employer). But this argument ignores black-letter Ohio law stating that harassment by coworkers can create a "hostile work environment," which in turn violates of Ohio Rev. Code § 4112.02(A). *See Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 732 (Ohio 2000). It follows that Plaintiff's complaint of coworker harassment could legally constitute opposition to "an unlawful discriminatory practice defined in" Ohio Rev. Code § 4112.02. *See* Ohio Rev. Code § 4112.02(I). As we noted above, moreover, the operative question is not whether Rossi's and Wells' conduct was actually unlawful, but whether Plaintiff held an objectively reasonable and good faith belief to that effect. *See Booker*, 879 F.2d at 1312–13. The jury answered that question in the affirmative, and the record does not compel a conclusion to the contrary. *See Rhinehimer*, 787 F.3d at 811 ("[T]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation or otherwise justified the

employee's belief that illegal conduct was occurring." (second alteration in original) (internal quotation marks omitted)).

## B.     UJC's knowledge of Plaintiff's protected activity

UJC's arguments regarding the second element of Plaintiff's prima facie case are also unpersuasive.  To establish that element, Plaintiff needed to proffer "evidence sufficient to establish that the individuals charged with taking the adverse employment action knew of" Plaintiff's complaint. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002); *Baker*, 713 N.E.2d at 491.  The evidence presented at trial satisfied that standard: Plaintiff's complaints were made to Parsons, who testified that he "[a]bsolutely" provided input on the decision to terminate her employment.  (R. 121, PageID 1873.)  And Gordon, who testified that he ultimately made the termination decision, admitted on cross examination that he was aware of Plaintiff's complaints of "harassment" by Rossi and Wells, but that he did not think that the complained-of behavior actually constituted harassment.  We find this evidence more than "sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall*, 287 F.3d at 552.

## C.     Causation

To establish the fourth element of her prima facie case, Plaintiff was required to "proffer evidence sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action." *Spengler v. Worthington Cylinders*, 615 F.3d 481, 493 (6th Cir. 2010) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 588 (6th Cir. 2009)).  "Closeness in time is one indicator of a causal connection," *id.* at 494, "[b]ut where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality," *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  *See also Spengler*, 615 F.3d at 494–95 (holding a span of roughly three weeks between the plaintiff's complaint and termination created an inference of causation when coupled with a change in his supervisor's behavior); *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516–17 (6th Cir. 2009)

(considering temporal proximity in conjunction with "whether the employer treated the plaintiff differently from similarly situated individuals").

In this case, the evidence produced at trial established that Plaintiff was terminated roughly three weeks after she sent her email to Rossi and Parsons. This is comparable to the roughly three-week gap that we found significant in *Spengler*, 615 F.3d at 494–95. Importantly, this temporal proximity was coupled with Plaintiff's testimony that she did not commit the errors for which she was purportedly terminated, or that some of those same errors were sometimes committed by non-terminated male coworkers. Together, these facts were sufficient to establish the fourth element of Plaintiff's prima facie case.[6] *See Barrett*, 556 F.3d at 516–17.

### D.     Pretext

Lastly, UJC argues that Plaintiff's evidence was insufficient to show that UJC's professed legitimate reasons for her termination were a pretext for retaliation. "A plaintiff can demonstrate pretext by showing that the employer's proffered reason for the adverse action (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016) (internal brackets omitted) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

Plaintiff adduced evidence that UJC's legitimate reasons for her termination were pretextual using all three of the above methods. She testified that many of her alleged wrongdoings had no basis in fact: she denied committing some of the procedural violations of which she was accused or explained that her actions did not actually deviate from standard procedures or violate regulations. Plaintiff also testified that the alleged violations of procedures and regulations "did not actually motivate" her termination, *id.*; rather, Gordon told her that she was fired for sending "[i]nappropriate e-mails" and because her "[c]onduct while on the road . . .

---

[6]We disagree with UJC's contention that because the complained-of harassment was perpetrated by coworkers, Plaintiff was required to establish the fourth element of her prima facie case using the so-called "cat's paw" theory of causation under Title VII. That theory involves imputing the unlawful animus of a non-decisionmaker onto the plaintiff's employer where the non-decisionmaker precipitated the adverse employment action for discriminatory reasons. *See generally Staub v. Proctor Hosp.*, 562 U.S. 411 (2011). But here, Gordon's *retaliatory* animus is what created liability, not Rossi's and Wells' *discriminatory* animus. Thus, there was no need for Plaintiff to impute her coworkers' motivations onto Gordon.

while not performing job functions was not in line with [UJC's] image." (R. 120, PageID 1666–67.)  Finally, Plaintiff proffered evidence that, to the extent she may have violated procedures and regulations, such violations were "insufficient to warrant" her termination because they were commonplace among male employees who were not punished.  *See Jackson*, 814 F.3d at 779. The jury found such evidence sufficient to prove that UJC's excuses were pretextual; the record does not compel us to hold otherwise.

In sum, it is not the case that "reasonable minds could come to but one conclusion in favor of" UJC, *Smith*, 813 F.3d at 306, and we therefore affirm the district court's denial of UJC's motion for a directed verdict.  Similarly, after "review[ing] the evidence and the district court's ruling," we are not left with "a definite and firm conviction that the district court committed a clear error of judgment" by declining to order a new trial.  *Callahan*, 801 F.3d at 617 (internal quotation marks omitted).

## II.    UJC's Objections to the Award of Punitive Damages and Attorney Fees

UJC argues that the district court abused its discretion by denying UJC's motion for remittitur of punitive damages.  We note, however, that UJC's briefing on this issue addresses only the legal sufficiency of the evidence supporting the jury's award of punitive damages in this case.  (*See, e.g.*, Def.'s Br. at 40–41 ("As a matter of law there was not sufficient evidence to allow a jury to conclude that UJC had acted with actual malice.").)  In other words, UJC makes no argument that the punitive damages awarded to Plaintiff were excessive, rather than legally unavailable to Plaintiff due to insufficient evidence proffered at trial.  *Cf. Sykes v. Anderson*, 625 F.3d 294, 322–23 (6th Cir. 2010) (setting out a fact-intensive, three-factor test for determining whether remittitur is necessary to correct an excessive punitive damages award). Notwithstanding the fact that these sufficiency arguments are likely waived,[7] we find them unpersuasive.

---

[7]This case is analogous to *Sykes*, in which we held that the defendants had waived their argument that "the evidence at trial failed to show that the Defendants' actions were reprehensible enough to support a punitive-damages award" because the defendants failed to raise that argument in their pre-verdict Rule 50(a) motion.  *See* 625 F.3d at 322.  The only arguments preserved by UJC's Rule 50(a) motions concerned the merits of Plaintiff's retaliation claim.

"It is well-settled that [Ohio Rev. Code §] 4112.99 permits an award of punitive damages in a discrimination claim" brought under Ohio Rev. Code Chapter 4112.  *Waddell v. Roxane Labs., Inc.*, No. 03AP-558, 2004 WL 1103710, at *13 (Ohio Ct. App. 2004).  To receive punitive damages, Ohio law requires a Plaintiff to prove by clear and convincing evidence, *see* Ohio Rev. Code § 2315.21(D)(4)), that the defendant possessed "actual malice."  *Preston v. Murty*, 512 N.E.2d 1174, 1175 (Ohio 1987).  "[A]ctual malice . . . is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm."  *Id.* at 1176.

Below, the district court held that Plaintiff adduced sufficient evidence of actual malice at trial because her evidence suggested that "UJC relied upon acceptable or routinely tolerated behavior to support its decision to terminate plaintiff's employment, and . . . this decision came within weeks of plaintiff's written report of alleged sexual harassment."  (R. 163, PageID 2997.)  On review of the record, we agree with the district court that such evidence provided a sufficient basis on which the jury could find, by clear and convincing evidence, that UJC acted with actual malice when it terminated Plaintiffs' employment.  We therefore have no reason to believe that "reasonable minds could come to but one conclusion" in favor of UJC, *Smith*, 813 F.3d at 306, or that the district court abused its discretion by denying UJC's motion for remittitur, *see Am. Trim, L.L.C. v. Oracle Corp.*, 383 F.3d 462, 475 (6th Cir. 2004) (holding that a district court abuses its discretion by remitting damages where "there is any credible evidence to support [the] verdict").

We are likewise unpersuaded by UJC's argument that the district court abused its discretion by granting Plaintiff's motion for attorney fees.  Under Ohio law, "[i]f punitive damages are proper, the aggrieved party may also recover reasonable attorney fees." *Columbus Fin., Inc. v. Howard*, 327 N.E.2d 654, 658 (Ohio 1975).  The Supreme Court of Ohio has reaffirmed this principle as recently as 2000, *see Galmish v. Cicchini*, 734 N.E.2d 782, 795 (Ohio 2000); the Court of Appeals of Ohio has reaffirmed this principle as recently as 2014, *see Whetstone v. Binner*, 15 N.E.3d 905, 911 (Ohio Ct. App. 2014).  *Tinney v. Tite*, No. H-11-006, 2012 WL 1900546 (Ohio Ct. App. 2012), upon which UJC relies, neither addresses nor abrogates this principle of Ohio law.

**III.    Amendment of the Judgment**

**Standard of Review**

We review a district court's decision to grant relief pursuant to Federal Rule of Civil Procedure 60(a) for abuse of discretion.  *See In re Walter*, 282 F.3d 434, 440 (6th Cir. 2002). "A clear example of an abuse of discretion exists where the trial court fails to consider the applicable legal standard or the facts upon which the exercise of its discretionary judgment is based." *Id.* (quoting *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997)).

**Analysis**

Under Rule 60(a), a district court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record." Fed. R. Civ. P. 60(a).  "The basic purpose of the rule is to authorize the court to correct errors that are mechanical in nature." *In re Walter*, 282 F.3d at 440.  Whereas Rule 60(a) may *not* be used in "instances where the court *changes its mind*, either because it made a legal or factual mistake in making its original determination," *id.* (quoting *Blanton v. Anzalone*, 813 F.2d 1574, 1577 n.2 (9th Cir. 1987)), the Rule *can* be used to "correct mistakes or oversights that cause the judgment to fail to reflect what was intended at the time of trial," *id.* at 441 (quoting *Vaughter v. E. Air Lines, Inc.*, 817 F.2d 685, 689 (11th Cir. 1987)).  In sum, "when a court has undertaken to make the judgment or record speak the truth rather than something other than what was originally pronounced[,] the court has not abused its discretion in granting relief under Rule 60(a)." *Id.* (internal quotation marks omitted).

Below, the district court held that Rule 60(a) provided the necessary authority for amending Plaintiff's judgment against Ultimate Jetcharters, Inc. to reflect that Ultimate Jetcharters, LLC was UJC's proper moniker.  Whether this use of Rule 60(a) was appropriate under the circumstances appears to be an issue of first impression in this Circuit.  However, as noted by the district court, our analysis need not start from scratch: the Second Circuit's decision in *Fluoro Electric Corp. v. Branford Associates*, 489 F.2d 320 (2d Cir. 1973), addressed a similar use of Rule 60(a).

In *Fluoro*, the plaintiff sued "Branford Associates, a corporation" for breach of contract. *Id.* at 322. In its answer, the defendant described itself as "Branford Developers, Inc. (sued herein as Branford Associates)." *Id.* The plaintiff ultimately obtained a judgment against "Branford Associates, a corporation, a/k/a Branford Developers, Inc." *Id.* It was later revealed, however, that "Branford Associates" was a partnership, not a corporation; and "Branford Developers, Inc." was an entity wholly separate from the partnership. *Id.* at 323–24. When the plaintiff attempted to collect on the judgment from a bank holding an account in the name of "Branford Associates," the bank requested clarification before releasing any funds. *Id.* at 322. In response, the plaintiff filed a Rule 60 motion to strike the words "a corporation" from "Branford Associates," thus allowing the plaintiff to collect against the partnership. *Id.* The district court granted the motion over the defendant's opposition. *Id.* at 323.

The Second Circuit affirmed, holding that the district court had simply "correct[ed] . . . a misnomer under Rule 60(a)." *Id.* at 326. In so doing, the court stressed that

> [t]o the plaintiff, to the trial judge, and to the jury it was plain that only one group of men had contracted with the plaintiff, a group known as Branford Associates. . . . [U]nder the circumstances, it is clear that it was Branford Associates which the plaintiff sought to hold liable, regardless of its legal status.

*Id.* at 325. The court also noted that, because the case was litigated as though the partnership were a party, no practical prejudice resulted from correction of the judgment: "Had this [misnomer] been corrected earlier, no other persons would have been served in the action. No others would have appeared before the court." *Id.* at 326. Finally, the court found it relevant that the defendant's own actions during the trial contributed to any confusion between the partnership and the corporation:

> [W]hen the [district] court charged the jury to the effect that the defendant was 'Branford Associates, Inc.,' no objection or request for modification was raised by the defense. In fact, it appears that there was never any objection in open court, or during the pretrial stages, to the repeated use of the phrase 'Branford Associates' or 'Branford Associates, Inc.' in references to the defendant by the court and by the plaintiff.

*Id.* at 325.

The facts of this case bear a number of similarities to those in *Fluoro*. Even a cursory review of the record reveals that the parties, the judge, and the jury knew that Plaintiff's suit was brought against her former employer, regardless of that entity's name or legal structure. Indeed, the entire case was litigated as though Plaintiff's former employer—Ultimate Jetcharters, LLC—was the defendant. As one example, UJC's defense included the testimony of numerous LLC employees—not the least of whom was John Gordon, the president and CEO of the LLC—and that testimony was presented by counsel from the same small law firm that now represents the purportedly non-liable Ultimate Jetcharters, LLC.[8] In sum, there is no reason to believe that the trial would have looked any different had the misnomer been corrected earlier in the proceedings. Thus, no practical prejudice resulted from correction of the judgment to reflect that Ultimate Jetcharters, LLC was the proper moniker of the defendant against whom judgment was entered.

Further likening this case to *Fluoro*, UJC's witnesses and counsel were complicit in representing that Ultimate Jetcharters, Inc. was the defendant's proper name. UJC's contribution to any confusion started early: although UJC's answer ambiguously "admit[ted]" that it was "initially a corporation . . . but was converted to an [LLC]" (R. 4, PageID 40), UJC never argued that Ultimate Jetcharters, Inc. was the wrong defendant in its subsequent filings. Indeed, in its motion for summary judgment, UJC referred to itself as "Ultimate Jetcharters, Inc." and thereafter represented that that entity was Plaintiff's former employer. These misrepresentations continued into trial, as when the parties' joint proposed jury instructions identified "Ultimate Jetcharters, Inc." as Plaintiff's former employer; the parties' joint submission of stipulated facts committed the same "mistake," and those stipulated facts were read to the jury.[9]

We find *Fluoro*'s reasoning persuasive and its disposition appropriate under the circumstances of this case. Based on the above facts, it is clear that the judgment's listing of

---

[8]The letter to Plaintiff's counsel from UJC indicates that Ultimate Jetcharters, LLC is represented by the law firm of McNamara, Demczyk Co., L.P.A. Sidney Freeman, who served as Ultimate Jetcharters, Inc.'s lead defense counsel at trial and whose name appears on UJC's briefs before this Court, is "of counsel" at that law firm.

[9]Before these instructions and stipulated facts were read to the jury, the district court held a sidebar in order to discuss with counsel some stylistic changes that it wanted to make to those documents. The court stated: "there are a number of times where 'Inc.' is included. We[] already defined Ultimate Jetcharters, so we're just going to take the 'Inc.' out because we've defined it that way previously." (R. 123, PageID 2483.) UJC's counsel made no objections or clarifying statements at that time.

Ultimate Jetcharters, Inc. as defendant was a simple misnomer.  Affirming the district court's application of Rule 60(a) in this case therefore comports with our own Circuit's precedent establishing that Rule 60(a) may be used to "correct mistakes or oversights that cause the judgment to fail to reflect what was intended at the time of trial." *In re Walter*, 282 F.3d at 441. Stated in the negative, nothing about the proceedings below suggests this was an "instance[] where the court *change*[*d*] *its mind*." *Id.*  (quoting *Blanton*, 813 F.2d at 1577 n.2).

Finally, we would be remiss if we did not mention the letter UJC sent to Plaintiff's counsel when Plaintiff attempted to collect on the judgment.  After implying that the judgment was useless against Ultimate Jetcharters, LLC, that letter nevertheless offered Plaintiff $125,000.00 in settlement of her judgment against Ultimate Jetcharters, Inc.  We find it unlikely that UJC would have offered such a generous settlement had it genuinely believed itself to be a victim of circumstance, or that it would be deprived of due process by virtue of an amendment to the judgment.  Rather, we agree with the district court that the letter is more indicative of a litigation strategy based on "roll[ing] the dice at trial and then hid[ing] behind a change in corporate structure when it comes time to collect on the judgment." (R. 185, PageID 3201.)  We decline to endorse that strategy, and hold that Rule 60(a) provided a proper basis for amending the judgment to reflect UJC's correct moniker.

## CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment in full.