[Cite as *Ferguson v. ProMedica Cent. Physicians, L.L.C.*, 2018-Ohio-4358.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Eric Ferguson, M.D.

Court of Appeals No. L-17-1259

Appellant

Trial Court No. CI0201602822

v.

ProMedica Central Physicians,
LLC, et al.

**DECISION AND JUDGMENT**

Appellees

Decided: October 26, 2018

* * * * *

John D. Franklin and Marilyn L. Widman, for appellant.

Margaret J. Lockhart and Marshall A. Bennett, for appellees.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Eric Ferguson, M.D., appeals the judgment of the Lucas County Court of Common Pleas, which awarded summary judgment in favor of appellees, ProMedica Central Physicians, LLC, The Toledo Hospital, and Daniel K. Cassavar, M.D., on appellant's claim for retaliation. For the reasons that follow, we affirm.

## I. Facts and Procedural Background

{¶ 2} Appellant began his employment with ProMedica Central Physicians in 2006. In 2011, while employed through ProMedica Central Physicians, appellant began working full-time at The Toledo Hospital as a trauma, general, and critical care surgeon. In April 2013, the existing trauma medical director for The Toledo Hospital retired, and appellant was named Interim Trauma Medical Director. As Interim Trauma Medical Director, appellant oversaw the trauma team, which consisted of trauma surgeons as well as advanced practice providers (both physicians' assistants and nurse practitioners), also known as "APPs" or "midlevels." In addition, appellant was responsible for successfully guiding The Toledo Hospital through the reverification process to remain a Level 1 trauma center.

{¶ 3} During appellant's time as Interim Trauma Medical Director, the midlevels raised several complaints about their compensation, schedule, working conditions, and lack of staffing. At that time, the midlevels were employed directly by The Toledo Hospital, and appellant was not responsible for setting the midlevels' pay or for hiring or assigning the midlevels to the trauma team.

{¶ 4} In addition to their general complaints, the midlevels also complained about appellant specifically. Wendy Papenfuss, Director of Human Resources for The Toledo Hospital, testified that the midlevels reported in July 2014 to her and Dr. Joseph Sferra, Director of Surgical Services at The Toledo Hospital, that appellant was "disrespectful, tried to exploit others' mistakes, and was sometimes spiteful." She stated that the

2.

midlevels "indicated a reluctance to report his behavior, for fear of retribution and retaliation." Wendy Jolliff, Assistant Director of the Advanced Practice Provider Department, testified that beginning in September 2014, when she became the midlevels' direct supervisor, she received numerous complaints about appellant, that he was rude and disrespectful, and that he would belittle the midlevels in front of patients and other employees. Jolliff stated that there were more complaints about appellant than about the midlevels' compensation or schedule, and that she would receive phone calls in the evening and on the weekends from midlevels who had poor interactions with appellant.

{¶ 5} Thereafter, in September 2015, the midlevels met again with Sferra, Papenfuss, and Jolliff, to express their concerns and displeasure with appellant. The midlevels presented a document that detailed some of their complaints, including that many of the trauma team members have left during appellant's tenure as the interim trauma medical director, that the team has eroded under his leadership, that he is disruptive during rounds towards all providers, that his temperament is unpredictable and he alienates those around him, and that he is unapproachable and dismissive regarding questions about patient management.

{¶ 6} Notwithstanding the concerns and complaints from the midlevels, in October or November 2015, Sferra, along with Arturo Polizzi, President of The Toledo Hospital, and Lori Johnston, President of ProMedica Central Physicians, decided to remove the interim label and name appellant the permanent trauma medical director. The decision came after an unfruitful two-year nationwide search to find a permanent replacement.

3.

Notably, appellant had interviewed for the position in 2014, but was not selected at that time. Sferra testified that it was a difficult decision to remove the interim label, and that he had concerns about appellant's ability to perform the duties of the job, as well as concerns that he would have a very unhappy group of midlevels and that they may even lose some surgeons. Sferra explained, however, that because appellant had been making substantial contributions towards The Toledo Hospital's goal of maintaining its Level 1 trauma center designation, Sferra thought that their best bet for getting through an upcoming site visit was to name appellant the permanent trauma medical director.

{¶ 7} On December 11, 2015, the decision was announced to all of the ProMedica employees by Lori Johnston and Daniel Cassavar in their weekly "5 Things to Know" email. At that time, Johnston and Cassavar were Co-Presidents of ProMedica Central Physicians, but Johnston assumed responsibility for the trauma surgeons. Cassavar testified that he was not involved in the search for the trauma medical director, or in the decision to name appellant the permanent trauma medical director.

{¶ 8} Shortly after appellant was named the permanent trauma medical director, appellant hosted a Christmas party at his house on a Saturday, and invited the entire trauma team. One of the midlevels who attended was S.P. Appellant testified that at the party, S.P. would follow him around as he went from group to group greeting people. At one point, appellant and S.P. were talking with a group of people and the subject of appellant's tattoos came up. S.P. then asked appellant if it was true that he had a nipple ring, which he confirmed. Appellant testified that on another occasion that evening, S.P.

4.

reached up and stroked his chest, found his nipple ring, and tugged on it while making a sexual sound. Later in the evening, after nearly all of the guests had left, S.P. pinned appellant up against the kitchen counter, put her hand on his chest, and closed her eyes and leaned in as if she were going to kiss him. Just then, appellant's wife intervened, and S.P. hurriedly left.

{¶ 9} S.P. remembers the party differently. S.P. testified that while they were standing in a group talking, another co-worker brought up the subject and showed the group appellant's nipple ring. S.P. also recounted that at the end of the night, when she was in the kitchen with appellant, another person was present who made some comment about sexual tension between appellant and S.P. Appellant then grabbed S.P.'s hand and rubbed it on his nipple ring over his shirt. He also put his arm around S.P., and grabbed her hand and pulled it around him behind his back. Appellant then told the other person to leave. S.P. testified that after the other person left, appellant told her she was pretty. S.P. stated that she thought appellant might try to kiss her at that point, so she ducked her head down towards his neck and then pulled away. S.P. then saw appellant's wife, and left as fast as she could.

{¶ 10} The following Monday, December 14, 2015, appellant reported the incident to his supervisor, Sferra. Appellant also informed Deanna Sievert, The Toledo Hospital's Chief Nursing Officer, who reported the incident to The Toledo Hospital Human Resources. Later that day, after working with S.P. and doing rounds in a group setting, appellant spoke again with Sievert. Appellant conveyed that "everything has not been

5.

awkward today," and he felt that S.P. was embarrassed, and that nothing further needed to be done regarding the situation. At that time, appellant rejected Sievert's suggestion that he and S.P. meet together with someone from human resources.

{¶ 11} However, after his conversation with Sievert, appellant again encountered S.P. Appellant testified that S.P. approached him and wanted to talk about what had happened at the Christmas party. Appellant responded that he did not think they needed to talk about it, and that he was "good." Appellant stated that S.P. insisted that they talk, and because he did not like the appearance of her standing close to him talking about personal things, the two took a walk around the hospital. Appellant testified that during their walk, S.P. continued to want to talk about the situation, but he repeatedly deflected her conversation. S.P. testified that she wanted to talk to appellant because several months earlier appellant had written an incident report against her over the treatment of a patient, and as a result they had a communication breakdown in their working relationship for some time until they talked about what had happened. S.P. did not want the same breakdown to occur again.

{¶ 12} At some point during the walk, appellant and S.P. were paged to respond to an emergency trauma. After working the trauma, appellant went to his office. A few minutes later, S.P. let herself into his personal sleeping quarters, which were only accessible through a security code, and confronted him again about the Christmas party. Appellant recounted that S.P. blocked the exit and told him that she could not stop thinking about what had happened at the party and that she had sexual feelings for him.

6.

He testified that S.P. repeatedly suggested that "maybe we should just kiss," "maybe it would be bad and, you know, wouldn't even like it." Appellant rejected S.P.'s advances and ushered her out of his office.

{¶ 13} S.P., on the other hand, testified that she went up to his office because they had not finished their conversation. S.P. stated that she made a comment to him that "if he would have kissed me, it would have been bad and maybe we wouldn't even be discussing it," and they both laughed. She testified that appellant then began talking about something about being sleep deprived and being a surgeon, and she was unsure of what he was saying. S.P. acknowledged asking appellant at some point if he had feelings for her and if that was the reason he had historically treated her in what she perceived to be a bullying or mean manner.

{¶ 14} The next morning, December 15, 2015, appellant emailed Sievert to inform her of what happened the night before, and then followed up by meeting with her in person to determine how the situation should be handled. Appellant was instructed to report the incident to Papenfuss, Director of Human Resources. In addition to calling Papenfuss, appellant emailed her, writing "I believe these interactions are not work appropriate, and I really need some help to assure that the inappropriate interactions immediately stop, because I believe I am being harassed with this inappropriate behavior." Papenfuss directed one of her human resources specialists, Colleen Alexander, to address the situation.

7.

**{¶ 15}** Alexander interviewed appellant and S.P. on December 16 and 17, 2015, respectively. Both appellant and S.P. criticized Alexander's investigation. Appellant felt that Alexander was not taking his complaints seriously, was too focused on his personal life, and did not believe his version of the events. S.P. felt that Alexander was aggressive and threatening. Both felt that their statements were not accurately summarized.

**{¶ 16}** On December 21, 2015, upon the conclusion of the investigation, appellant met with Alexander and Sferra. At the meeting, Alexander communicated her conclusion, which was reached in conjunction with Papenfuss and ProMedica's legal department, that no sexual harassment occurred. She and Sferra informed appellant that he would have to find a way to work with S.P. Appellant commented that "If the roles were reversed, this would be handled differently," to which Alexander replied, "That might be."

**{¶ 17}** On the same day, S.P. met with Alexander and Jolliff. S.P. was instructed to stop trying to talk with appellant about the party. S.P. also ultimately received formal written discipline for discourteous treatment of appellant.

**{¶ 18}** Following the investigation, appellant began to alter his work behavior. For example, he refused to conduct patient rounds with S.P. unless a third person was with them. If a third person was unavailable, appellant would either wait or tell S.P. that he would do the rounds alone. S.P. testified that appellant also directed others to report on patients that she had examined, that he would ignore her, and that he would be mean and give her the silent treatment.

8.

{¶ 19} During this time, in January 2016, Lori Johnston stepped down as co-president of ProMedica Central Physicians, leaving Daniel Cassavar as the president and appellant's superior.

{¶ 20} On February 14, 2016, an incident occurred again between appellant and S.P. An email from appellant to Cynthia Edwards-Tuttle, ProMedica Central Physicians Vice President of APPs, and Jolliff described what happened:

Just a heads up: [S.P.] announced today at the nursing station and in the presence of another PA that, "we need to talk" and indicated she wants to meet with you and Wendy Jolliff.

As usual, she attempted to stand too close to me today on multiple occasions, and I attempted to subtly put some distance between us. She also wanted to see patients alone together, and I indicated we should wait for the other PA, or that I would see the patients myself since she had already seen them on pre-rounds.

Also as usual, I am extremely uncomfortable around her in view of her past behavior, however, I am polite and focused on maintaining appropriate distance between her and me while providing appropriate care to our trauma patients.

S.P., again, had a different view of the events as documented in her email to Jolliff:

He acted the same way he did on Feb 10th but with a little more attitude. He disregarded me, talked past me about everything to Amy P, &

made it blatantly obvious that he didn't want to be near me. It was almost like he was trying to put on a show to not be near me. It was not subtle. When he was going to go see 2 of my patients on 19, I went to go with him since Amy P was putting orders in. He told me not to go with him. I told him this was not acceptable and was there something that needed to be discussed. He told no (sic) & that I was to (sic) close to his space bubble & he was not going to discuss anything. I told him that I would just talk to Wendy or Cindy about it. He said fine. I called Wendy & discussed the situation & I also spoke with Cindy. They were both already aware of the situation b/c he had emailed them. Later in the shift when we were seeing some consults in the EC & he was able to call me out of a room, walk alone with me down the hall, and go see a patient without any difficulty. I then had to go get him out of a Level to go see this patient again and he was able to go see the patient with me alone without any problem again.

Information about the incident was forwarded to Papenfuss and Sferra, but no investigation was completed.

{¶ 21} The next week Cassavar met with surgeons that were part of appellant's practice group. The meeting had been requested by Dr. Dan Benson, Dr. Nate Cotterman, and Dr. Ryan Kidner, but Cassavar only remembered Benson and Kidner

10.

being present.[1] Notably, Benson had previously interviewed for the trauma medical director position, and the record demonstrates that there was a feeling amongst some of the midlevels that he was the best candidate for the position. At the meeting, Benson and Kidner expressed their concerns that because of appellant they were going to lose their medical assistants and two of the physicians in their group. Benson and Kidner were worried that the entire trauma service was going to implode under appellant's leadership.

{¶ 22} In particular, Benson and Kidner relayed that students and residents were not treated well and did not like being on the trauma service because they felt that appellant was using them as scribes to take notes and was not teaching them.[2] Cassavar later spoke with one of the residents who stated that appellant was not a very good surgeon and it was well known amongst the residents to not scrub in with appellant in order to avoid being part of a lawsuit.[3] Benson and Kidner further described that appellant was banned from teaching medical students and residents, and that their practice group lost a residency position to Sferra's group because appellant was pulling the residents out of general surgery, where they should have been, to do trauma surgery so that they could act as appellant's scribes. Cassavar recalled that it was his

---

[1] Cassavar was certain that Benson was there, and believed the other person was Kidner, not Cotterman.

[2] A scribe is a low-level position that is responsible for following a doctor and taking notes. Cassavar testified that he could employ a scribe at one-third the cost of employing an advanced practice provider.

[3] Appellant testified that he has never been the subject of a medical malpractice suit.

11.

understanding that the residents were having such a bad rotation with appellant's group that they persistently complained until Sferra agreed to switch their rotation to his group.

{¶ 23} Cassavar's notes from the meeting also reveal that Benson and Kidner indicated that the midlevels were not treated well by appellant and Sferra, and that appellant in particular abused, demeaned, and bullied the midlevels, and required them to act as scribes. After the meeting, Cassavar confirmed with Edwards-Tuttle that the midlevels were unhappy in their role and were leaving, and that Edwards-Tuttle was having a difficult time getting more midlevels to the trauma service. Benson and Kidner also mentioned that appellant would not walk alone with a female midlevel, which reaffirmed Cassavar's belief that appellant was "just a bit quirky."

{¶ 24} In addition, Benson and Kidner raised concerns regarding appellant's performance during morbidity and mortality conferences and peer review. They claimed that appellant had an agenda against certain surgeons, that he pitted surgeons against one another, and that he had lost the real purpose of morbidity and mortality conferences. Benson and Kidner also complained about appellant's conduct in sending a patient chart to an outside party for review within days of the patient's death.

{¶ 25} Cassavar testified that he believes that after the meeting he spoke with Johnston about what he had learned. Within the next two days, Cassavar then spoke with Sferra and Arturo Polizzi to let them know that he was not going to renew appellant's contract.

12.

**{¶ 26}** On February 25, 2016, Cassavar met with appellant and informed him that they were not going to renew his contract, which expired on March 31, 2016. Cassavar testified that appellant conveyed that he understood that it was difficult for Cassavar to make that decision. Appellant, on the other hand, described that he was stunned, and he assigned the cause to "that Nurse Practitioner thing." Appellant testified that Cassavar responded, "these things happen all the time." In contrast, Cassavar testified that he replied, "[N]o. This is bigger than that. That's not the issue." Cassavar further explained that he knew that there had been an inappropriate situation involving appellant that occurred at a holiday party, but that was the extent of his knowledge. Cassavar testified that he was not aware that appellant had made a subsequent complaint that the same midlevel, S.P., was standing too close to him, that he was uncomfortable, and that he did not want to round alone with S.P.

**{¶ 27}** On May 20, 2016, following the non-renewal of his contract, appellant initiated the present action when he filed his complaint alleging retaliation for engaging in the protected activity of reporting sexual harassment, in violation of R.C. 4112.02(I).[4] The parties conducted extensive discovery, after which appellees moved for summary judgment. Appellees argued that appellant failed to establish a prima facie case of

---

[4] In his complaint, appellant also asserted claims of sexual harassment creating a hostile work environment, gender discrimination, aiding and abetting the perpetuation of gender discrimination and retaliation, and negligent hiring, retention, and supervision. The trial court granted summary judgment in favor of appellees on these claims, and appellant has not raised any assignments of error relative to them. Therefore, they are not a subject of this appeal and will not be discussed.

13.

retaliation because he could not demonstrate that Cassavar was aware that appellant engaged in protected conduct. Appellees also argued that appellant failed to demonstrate a causal connection between the alleged protected activity and any adverse action. Specifically, they argued that Cassavar made his decision after meeting with Benson and Kidner, and learning that both physicians and midlevels were planning to leave the trauma service because of appellant. Finally, appellees argued that even if appellant was able to establish a prima facie case of retaliation, appellees presented a legitimate non-retaliatory business reason for not renewing appellant's contract based on his performance, and that reason was not pretextual. On September 25, 2017, the trial court granted appellees' motion for summary judgment.

## II. Assignments of Error

{¶ 28} Appellant has timely appealed the trial court's judgment, and now asserts two assignments of error for our review:

I. The Trial Court committed prejudicial and reversible error when it applied the wrong legal standard in evaluating Ferguson's claim of unlawful retaliation under O.R.C. § 4112.02(I) in granting Appellees' Motion for Summary Judgment.

II. The Trial Court committed prejudicial and reversible error when it granted Appellees' Motion for Summary Judgment on Ferguson's retaliation claim as there are genuine issues of material fact as to whether

14.

Appellees' proffered reason for Ferguson's termination was merely pretext for retaliation.

### III. Analysis

{¶ 29} Because both of appellant's assignments of error challenge the award of summary judgment, we will address them together. We review the grant or denial of a motion for summary judgment de novo, applying the same standard as the trial court. *Lorain Natl. Bank v. Saratoga Apts.*, 61 Ohio App.3d 127, 129, 572 N.E.2d 198 (9th Dist.1989); *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Under Civ.R. 56(C), summary judgment is appropriate where (1) no genuine issue as to any material fact exists; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and viewing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978).

{¶ 30} Appellant has filed his retaliation claim under R.C. 4112.02(I), which provides,

It shall be an unlawful discriminatory practice: * * * (I) For any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section or because that person has made a charge, testified, assisted, or

15.

participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code.

{¶ 31} To establish a prima facie case of retaliation, a claimant must prove that "(1) [he] engaged in a protected activity, (2) the defending party was aware that the claimant had engaged in that activity, (3) the defending party took an adverse employment action against the employee, and (4) there is a causal connection between the protected activity and adverse action." *Greer-Burger v. Temesi*, 116 Ohio St.3d 324, 2007-Ohio-6442, 879 N.E.2d 174, ¶ 13. "If a complainant establishes a prima facie case, the burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for its actions." *Id.* at ¶ 14, quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). "If the employer satisfies this burden, the burden shifts back to the complainant to demonstrate 'that the proffered reason was not the true reason for the employment decision.'" *Id.*, quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

{¶ 32} Here, appellees concede for purposes of summary judgment that an adverse employment action was taken against appellant. Appellees also concede for purposes of summary judgment that appellant's December 2015 complaints were protected activity. Thus, the issues left to be resolved are whether appellant's February 14, 2016 email to Cynthia Edwards-Tuttle and Wendy Jolliff constituted a protected activity, whether Cassavar was aware of appellant's December 2015 and February 14, 2016 complaints,

16.

and whether a causal connection exists between the complaints and the non-renewal of appellant's contract.

### A. Protected Activity

{¶ 33} In its decision granting summary judgment, the trial court found that appellees conceded that appellant engaged in protected activity. Nevertheless, the trial court held that there could not be a causal connection between appellant's reporting and the adverse employment action because S.P.'s February 2016 conduct did not rise to the level of sexual harassment. In his first assignment of error, appellant argues that the trial court applied the wrong standard. Appellant argues that, contrary to the trial court's reasoning, he need not prove that S.P.'s conduct constituted sexual harassment. Instead, he must prove only that he had a good faith belief that it was sexual harassment for his complaint to be a protected activity. This view is supported by *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312-13 (6th Cir.1989), in which the Sixth Circuit recognized that "[a] person opposing an apparently discriminatory practice does not bear the entire risk that it is in fact lawful; he or she must only have a good faith belief that the practice is unlawful." *See also Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir.2016) (applying the good-faith principle to a factual scenario where the plaintiff had reported allegations of gender discrimination and harassment to her superior).

{¶ 34} However, not only must appellant have a good faith belief that S.P.'s conduct constituted sexual harassment, his response in light of that belief must also be

17.

sufficiently clear to convey that he is reporting harassment or discrimination. *See Braun* at 511 ("[A] vague charge of discrimination * * * is insufficient to constitute opposition to an unlawful employment practice."). But it is not required that the complaint "be lodged with absolute formality, clarity, or precision." *Id.* It is on this point that appellees argue that appellant's February 14, 2016 email was not protected activity. Appellees note that in the email, appellant neither alleges nor complains of sexual harassment. Further, appellant does not report S.P.'s conduct to Alexander or Papenfuss in Human Resources, but instead contacts S.P.'s supervisors Edwards-Tuttle and Jolliff. Finally, appellant does not request any response or action, but rather sent the email as "an FYI."

{¶ 35} We are not persuaded by appellees' position. In appellant's email, he complains that S.P. was standing too close to him, and that she wanted to see patients alone with him. He also states that he is uncomfortable around S.P., and that his uncomfortableness is related to her past behavior. When viewed in a light most favorable to appellant, we find that the mention of the close physical proximity, put into the context of S.P.'s past behavior, which appellant previously reported as sexual harassment, supports appellant's argument that his February 14, 2016 email was again reporting what he believed to be sexual harassment. Weighing against that conclusion is the fact that appellant did not report the incident to Human Resources, despite having previously gone through an investigation, and the fact that he only mentioned S.P.'s conduct as "an FYI." Nevertheless, in our view, the fact that appellant did report S.P.'s conduct to her superiors at least creates a genuine issue of material fact as to whether his February 14, 2016 email

18.

constituted a sexual harassment complaint. Therefore, we hold that summary judgment is not warranted on the basis that appellant failed to demonstrate a protected activity.

### B. Cassavar's Knowledge of the Protected Activity

{¶ 36} Under the second prong of the analysis, appellant argues that a genuine issue of material fact exists regarding whether Cassavar knew of the protected activity. In particular, appellant contends there is a genuine issue whether Cassavar's claim that he had no knowledge of appellant's complaints is truthful. Appellant highlights Cassavar's testimony that as President of ProMedica Central Physicians, he would like to be informed of anything related to the physicians who worked under him. Further, Cassavar spoke with Sferra around the time he made the decision not to renew appellant's contract, and appellant had complained to Sferra about S.P.'s conduct numerous times. Sferra testified that during that conversation, Cassavar mentioned that he had heard about "a lot of problems with [appellant]." Cassavar also spoke with Edwards-Tuttle frequently during that time, and Edwards-Tuttle was one of the recipients of the February 14, 2016 email. Thus, appellant infers that Sferra and Edwards-Tuttle must have notified Cassavar about appellant's complaints against S.P.

{¶ 37} In addition, Cassavar testified that he was aware of "an inappropriate situation that occurred at some holiday party over the recent past that was an issue." Cassavar's notes from his meeting with Benson and Kidner also reveal that he was informed that appellant would not walk alone with a female midlevel. Finally, during the meeting where Cassavar told appellant that his contract was not being renewed, appellant

19.

asked, "[I]t's that Nurse Practitioner thing, isn't it?" to which Cassavar replied, "this happens all the time," and/or "No, this is bigger than that." Appellant suggests that Cassavar's response demonstrates that he was aware of the sexual harassment complaints.

{¶ 38} Appellees, on the other hand, assert that Cassavar was unaware of appellant's protected activity. In addition to Cassavar's testimony that he was unaware, appellees note that appellant's December 2015 complaint occurred before Cassavar overtook responsibility for the trauma surgeons. Further, because S.P. was a Toledo Hospital employee, that complaint was handled by The Toledo Hospital Human Resources Department, and as such it was not unusual that the investigation would not be reported to ProMedica Central Physicians. Consistent with that, Johnston testified that she was not aware of appellant's harassment complaint until he filed the present lawsuit. Likewise, appellees also argue that Edwards-Tuttle was not aware of the December 2015 sexual harassment complaint, but rather simply knew that S.P. had been disciplined in connection with something that happened at a Christmas party.

{¶ 39} Appellees also argue that Cassavar's notes from his meeting with Benson and Kidner do not show that he was aware of appellant's protected activity. Instead, the notes demonstrate only that Cassavar knew that appellant was refusing to do rounds or walk alone with a female midlevel. There is no indication from the notes that Benson and Kidner relayed the fact that appellant had made sexual harassment complaints.

{¶ 40} Finally, appellees contend that Cassavar's statement in response to appellant questioning whether it was "that Nurse Practitioner thing" relate only to

Cassavar's general knowledge that something inappropriate had happened at a Christmas party, and not to any knowledge of appellant's protected activity.

**{¶ 41}** When viewing the evidence in a light most favorable to appellant, we find that a genuine issue of material fact exists regarding whether Cassavar was aware of both appellant's December 2015 and February 14, 2016 protected activity.

**{¶ 42}** Regarding Cassavar's knowledge of the December 2015 sexual harassment complaint, we find it reasonable to conclude that an instance of a doctor making a sexual harassment complaint against a female midlevel would come to the attention of the doctor's supervisors, which at the time were Sferra and Johnston. Indeed, Sferra was well aware of the allegations, having received them from appellant, and having been involved in the meeting where Alexander communicated the results of the investigation. We further find that a reasonable person could conclude that Johnston shared that information with Cassavar given their close working relationship as Co-Presidents of ProMedica Central Physicians, and the fact that Cassavar admitted to at least being generally aware of an incident at a Christmas party.

**{¶ 43}** Regarding the February 14, 2016 email, we find that Cassavar's knowledge from his meeting with Benson and Kidner that appellant was refusing to round or walk with a female midlevel, combined with his contemporaneous conversations with Edwards-Tuttle, who received appellant's email, could lead a reasonable person to conclude that Cassavar was aware of the email, and consequently was aware of appellant's uncomfortableness with S.P.'s conduct.

21.

**{¶ 44}** Therefore, we hold that a genuine issue of material fact exists regarding whether Cassavar had knowledge of appellant's protected activity, and summary judgment based on Cassavar's lack of knowledge is not appropriate.

### C. Causal Connection

**{¶ 45}** Finally, appellant argues that a genuine issue of material fact exists regarding whether there was a causal connection between the protected activity and the non-renewal of his contract. "In retaliation cases [under R.C. 4112.02(I)], the plaintiff must show that the retaliatory animus was the but-for cause of the adverse employment action. Thus, to prevail in a retaliation case, the plaintiff has the burden of establishing that the retaliatory animus was a determinative, not merely motivating, factor." *Smith v. Ohio Dept. of Pub. Safety*, 2013-Ohio-4210, 997 N.E.2d 597, ¶ 61 (10th Dist.), citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013). Here, we find that appellant has not demonstrated a genuine issue of material fact that appellees' proffered reason for the non-renewal of his contract was mere pretext.

**{¶ 46}** To establish his prima facie case of retaliation, appellant relied on several factors: first, the temporal proximity between his latest complaint against S.P. and the decision not to renew his contract; second, the fact that Sferra and another surgeon did not suffer any adverse employment action despite Benson and Kidner also complaining of their conduct to Cassavar; and third, the lack of any difference in circumstances other

22.

than his complaints regarding S.P. between the time he was elevated to the permanent trauma medical director and the time his employment contract was not renewed.

{¶ 47} In response, appellees offered that appellant's contract was not renewed because of his inability to be an effective leader of the trauma program. Appellant was then required to demonstrate that appellees' proffered reason was mere pretext. "A plaintiff may establish pretext by showing by a preponderance of the evidence '(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, or (3) that they were insufficient to motivate discharge.'" *Hollingsworth v. Time Warner Cable*, 157 Ohio App.3d 539, 2004-Ohio-3130, 812 N.E.2d 976, ¶ 23 (1st Dist.), quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994). Appellant addresses all three avenues for demonstrating pretext.

{¶ 48} First, appellant argues that a genuine issue of material fact exists regarding whether the proffered reason was based in fact. "[This] first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, i.e., that they are 'factually false.'" *Manzer* at 1084. Appellant asserts that appellees have vaguely claimed that he was causing disruption in the trauma team, and that it was going to lose multiple midlevels as a result of his behavior, but he states that appellees have failed to identify anyone who left because of him. Further, appellant argues that had appellees actually had concerns about his behaviors, they would not have promoted him to the permanent trauma medical director position. However, the record is

23.

clear that Cassavar was informed by Benson and Kidner that the trauma team was imploding, and Cassavar subsequently confirmed with Edwards-Tuttle that the midlevels were unhappy in their role and were leaving, and that she was having a difficult time bringing new midlevels onto the trauma service. In fact, the record is replete with testimony demonstrating that the midlevels were upset with appellant's behavior and leadership. Cassavar was also informed that the residents and students were being used as scribes and were not happy with their rotation.

{¶ 49} Appellant responds that these allegations are inadmissible hearsay statements, and thus should not be relied upon to demonstrate that he had leadership issues. Appellant's hearsay argument is misplaced. The pertinent fact is not whether the allegations about his behavior and leadership are true, but whether the allegations were made. Here, the record contains no evidence demonstrating that the allegations did not in fact exist. The existence of the allegations is important for two reasons. First, regardless of the truth of the allegations, we believe that the fact that continuous and consistent complaints against appellant have been made by a multitude of the midlevels on his team, as well as other surgeons in his group, demonstrates that appellant is not successfully leading the trauma team. Second, the pervasiveness of the complaints and Cassavar's confirmation with Edwards-Tuttle of the midlevels' issues support that Cassavar had an honest belief that appellant was not an effective leader of the trauma team. *See Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285-286 (6th Cir.2012) ("As long as the employer held an honest belief in its proffered reason, 'the employee cannot establish pretext even

24.

if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless.'"). Thus, we conclude that no genuine issue of material fact exists regarding whether the proffered legitimate reason for the non-renewal of appellant's contract was based in fact.

{¶ 50} Second, appellant argues that the proffered reason did not actually motivate his discharge. In this second showing, "the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." (Emphasis sic.) *Manzer*, 29 F.3d at 1084.

{¶ 51} Appellant asserts that for the one year that he was the assistant trauma medical director and the two years that he was the interim trauma medical director his alleged leadership and communication "issues" were not a concern to appellees, as evidenced by the fact that he was ultimately made the permanent trauma medical director. Appellant states that it was not until he made the complaints about S.P. that his performance and communication issues became a concern. However, the record demonstrates otherwise. Appellant was named the interim trauma medical director while appellees embarked on a two-year search to find a permanent replacement following his predecessor's retirement. During this time, numerous midlevels complained about appellant. After two years of searching, including interviewing and passing on appellant,

25.

appellees could not find a suitable candidate. Sferra testified that faced with the need to have a permanent trauma medical director to retain their Level 1 trauma hospital status, appellees then removed appellant's interim label, despite ongoing concerns about his leadership and ability to perform the job, and despite the knowledge that many of the midlevels and some of the physicians would be upset. Thus, contrary to appellant's argument, the record demonstrates that appellees were aware of and concerned about appellant's leadership and communication issues before appellant made the complaints against S.P..

{¶ 52} Appellant next claims that Cassavar's statement that "I know this is going to hurt the program, hurt the trauma program," which he made when he informed appellant that his contract would not be renewed, is evidence that appellant's alleged leadership issues did not motivate the adverse employment action because what was actually important to appellees at the time was appellant's work towards The Toledo Hospital's accreditation as a Level 1 trauma center. We disagree. Cassavar's statement merely recognizes that not renewing appellant's contract would have a negative impact on the hospital's accreditation efforts. It does not provide any evidence concerning the motivation behind the adverse employment decision, in particular, that the decision not to renew appellant's contract was motivated by appellant's sexual harassment complaint as opposed to his failure to successfully lead the trauma service team.

{¶ 53} Appellant last argues that Cassavar did not take the leadership issues identified by Benson and Kidner seriously, until he needed to fabricate a reason to end

appellant's employment. Appellant states that Cassavar did not investigate Benson and Kidner's claims that appellant created an unsafe work environment, or that he "hurts patients." However, while Cassavar did not investigate Benson and Kidner's claims— except by following up with Edwards-Tuttle and one of the residents—he did take the claims seriously, as demonstrated by his decision within the following days to not renew appellant's employment contract.

{¶ 54} Therefore, we find that appellant has not provided any evidence showing that the decision not to renew his contract was more likely motivated by retaliation for his filing a sexual harassment complaint than by legitimate concerns over his leadership of the trauma team.

{¶ 55} Third, and finally, appellant argues that the proffered reason was insufficient to motivate the adverse employment action. This third showing "consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.

{¶ 56} In support of his argument, appellant notes that during their meeting with Cassavar, Benson and Kidner also raised complaints about Sferra and another doctor in appellant's group. The record shows that Benson and Kidner reported disruptive or abusive behavior by both appellant and Sferra, indicating that appellant and Sferra displayed anger issues and engaged in tantrums. The record also shows that Benson and Kidner complained that their group had lost a number of medical assistants, and

27.

attributed those losses to appellant and the other doctor. Appellant reports that neither Sferra nor the other doctor were disciplined based on Benson and Kidner's complaints.

{¶ 57} However, we find that appellant has not demonstrated that Sferra and the other doctor have engaged in substantially identical conduct. The other doctor was alleged to have exhibited bad behavior towards the medical assistants in appellant's practice group. This conduct is separate and distinct from appellant's role as leader of the trauma team, in which he was accused of abusive, bullying, and demeaning behavior that generated a multitude of complaints and threats to leave from the midlevel providers on the team. In the same way, while Sferra was accused of disruptive and abusive behavior, the allegations were not as pervasive or detailed as those against appellant, which also included allegations that appellant treated the midlevels and residents as scribes, refused to be alone with female midlevels, lost the purpose of morbidity and mortality conferences, and sent a patient's chart to a third party within days of the patient's death. Furthermore, it was appellant, not Sferra or the other doctor, who was the trauma medical director, and it was his trauma team that was in danger of imploding under his leadership. Thus, we conclude that appellant has not demonstrated that the proffered reason of poor leadership and communication was insufficient to motivate appellees' decision not to renew his contract.

{¶ 58} Therefore, having found that appellant has failed to demonstrate a genuine issue of material fact showing that appellees' proffered reason was mere pretext, we hold

28.

that appellant has not satisfied the causal connection element of his claim for retaliation, and summary judgment in favor of appellees is warranted.

{¶ 59} Accordingly, appellant's first and second assignments of error are not well-taken.

## IV. Conclusion

{¶ 60} For the foregoing reasons, we find that substantial justice has been done the party complaining, and the judgment of the Lucas County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.      _____
                                                                  JUDGE

Arlene Singer, J.

                                         _____

James D. Jensen, J.                                   JUDGE
CONCUR.

                                         _____

                                                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.