NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0637n.06

Case No. 19-6334

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Nov 10, 2020
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| BRYAN ENNIS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| STATE OF TENNESSEE, dba University of | ) | TENNESSEE |
| Tennessee, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before: MERRITT, MOORE, and GIBBONS, Circuit Judges

**MERRITT, Circuit Judge.** Plaintiff Bryan Ennis, a former professor at the University of Tennessee at Chattanooga, appeals the district court's grant of summary judgment to the University on his hostile work environment and retaliation claims. Because Plaintiff fails to establish a *prima facie* case for either claim, we **AFFIRM** the district court.

## I. Factual Background

### i. Hiring

In the summer of 2013, Plaintiff accepted a position of Associate Professor in the Department of Civil and Chemical Engineering within the College of Engineering and Computer Science at the University of Tennessee at Chattanooga. Plaintiff's appointment was tenure track, with a six-year maximum probationary period. As part of his appointment, the University agreed

to provide start-up costs over two years for research funds and developing his laboratory. Additionally, Plaintiff's engineering firm, E&G Associates, loaned equipment to the University for use in Plaintiff's laboratory. In Plaintiff's outside interest disclosure form, he noted that he had an interest in E&G; the firm would maintain access to the equipment for consulting projects outside the University; he would continue to consult with E&G on an irregular basis; and that the firm may provide research grants to the University. Dr. William Sutton, Dean of the College at the time, reviewed this form, and indicated that Plaintiff's son was to take over E&G at some point; Plaintiff mentioned this in his interviews; and there was no conflict. Plaintiff began his employment with the University on August 1, 2013.

### ii.     Reappointment for 2014–2015 Academic Year

On January 30, 2014, Dr. Joseph Owino, the Department Head, wrote a memo to Dean Sutton, recommending Plaintiff's reappointment for the 2014–2015 academic year. Dr. Owino noted that, among other things, he considered the recommendation of the Rank, Tenure, and Promotion Committee, and that Plaintiff had "excellent student reviews" for the Fall 2013 Semester. In an evaluation dated March 31, 2014, for the 2013–2014 academic year, Plaintiff received from Dr. Owino an evaluation of "Exceeds Expectations[.]" Owino wrote that Plaintiff had "already demonstrated in his first year a clear dedication to student development and instruction[.]" After mentioning Plaintiff's achievements and contributions for the year, the evaluation concluded that Plaintiff "[l]ed significant team building and research efforts" and "[w]as responsible for large gifts to support research."

### iii.    Spring 2014

In the remainder of 2014, Owino began to notice a few problems with Plaintiff's performance. "First, his student teaching evaluation scores were below expectations." He also

had "two sons who were students in the College, and he had attempted to intervene with their professors on their behalf on a few occasions." As faculty evaluations began for the next academic year, Dr. Owino noted in a November 21, 2014, memorandum that Plaintiff's average student rating for the Spring 2014 semester was a "3.97 with a high of 5.92 and a low of 2.42 out of a possible score of 7.0." He stated that the "chemical engineering faculty's average [was] above 6.5 during the same period." Dr. Owino also wrote that "[t]here were several disturbing comments from the students that" he asked Plaintiff to address. He stated that because of the low teaching evaluations, he asked the University's Office of Audit and Consulting Services to elicit feedback from students. He claims he ordinarily makes such a request following a faculty member receiving low teaching evaluations.

### iv. Potential Elimination of the General Engineering Program

During the Spring and Fall of 2014, the College engaged in serious discussions about the potential elimination of the general engineering program. Some faculty members wanted to eliminate the program, and others wanted it retained. Dr. Cecilia Wigal had primary administrative responsibility over the program and was the most vocal proponent of it. Several faculty members supported her, including Plaintiff.

David Cummins, a prominent alumnus of the College, wrote a letter to Dr. Wigal on May 19, 2014, expressing his concern about the elimination of the program. He emailed Interim Dean Alp and Provost Ainsworth noting the same concerns.[1] Interim Dean Alp, Dr. Owino, and Dr. Frank Jones met with Plaintiff on October 24, 2014, to discuss Cummins' concerns, as Plaintiff and Cummins were close friends. According to Plaintiff, Dr. Owino and Interim Dean Alp suggested that he not talk to or associate with certain faculty, including Dr. Wigal. He claims that

---

[1] Alp served as Interim Dean of the College from May 8, 2014 until December 31, 2015.

he "objected to such requests as inappropriate and unprofessional as [he] believed this was gender discrimination in the treatment of Dr. Wigal." Interim Dean Alp and Dr. Owino both stated that they "may have cautioned [Plaintiff] to be mindful about internal politics and the impact such politics can have on one's professional development" but "never instructed [him] not to talk to anyone, including Dr. Wigal."

Plaintiff states that following this meeting, he expressed concerns "about being asked to not talk to certain faculty, especially as an 'untenured faculty' to several senior" faculty members in the College. He also relayed concerns about "the manner in which [Dr.] Wigal was being targeted, and her general engineering programs [being] eliminated without proper review." Plaintiff states that he also specifically discussed with senior faculty "the discrimination and retaliation [he] felt was being directed at Dr. Wigal" but does not indicate to whom he spoke.

Plaintiff spoke to Bryan Samuel of the Office of Equity and Diversity about the proposed elimination of the program. In a transcription from a May 11, 2015, interview with Samuel, Plaintiff stated:

> I in a set of circumstances have defended Wigal. And how the general engineering program has been handled. Okay, there are a set of open meetings and I said it's not so much as supporting her but subjecting to the process which things were being done. I don't' think they handled them correctly. Faculty are supposed to have input in these decisions and they weren't supposed to have input in these decisions. People perceive that I was supporting Dr. Wigal and it was basically retaliation for supporting Dr. Wigal. She's trying to defend her program and the fact that I'm not going along with the crowd and saying no this is not appropriate what are you doing, this is retaliation.
>
> …
>
> I believe there has been a set of retaliation against me because of my support or my perceived support of Dr. Wigal's program. What I'm more concerned about is the appropriate process weren't involved.

According to Samuel, Plaintiff never mentioned in any of his interviews or emails that he believed Dr. Wigal was a victim of gender discrimination. Plaintiff, however, claims that he did

discuss with Samuel gender discrimination and harassment towards Dr. Wigal. Additionally, Samuel received a complaint from Dr. Wigal asserting harassment and a hostile work environment based on gender discrimination. Dr. Wigal never mentioned Plaintiff as a corroborating witness. Samuel interviewed five potential witnesses, and none of them mentioned Plaintiff. Samuel was unable to substantiate Dr. Wigal's complaint.

### v. Fall 2014 Workshop

Plaintiff hosted a workshop in the Fall of 2014 for the Department and local industry representatives. Dr. Owino and Interim Dean Alp gave Plaintiff permission to conduct the workshop. Both expected that Plaintiff would collaborate with the University's marketing and event planning staff, but he conducted the workshop with little involvement from the University. Plaintiff promoted the event as a joint event hosted by the University and E&G Associates. At the time, both Interim Dean Alp and Dr. Owino thought Plaintiff had resigned from the firm and neither knew it would be a joint event.

The workshop was complimentary for all participants, which included industry representatives, students, and faculty. Plaintiff states that Provost Ainsworth and Chuck Cantrell, Associate Vice Chancellor of Communications and Marketing, praised the success of the event. According to Owino, alcohol was available at the event, which violated the University's fiscal policy and was problematic because several students were there. He stated that the event "was an embarrassing incident for the College that required the involvement of the Provost and the Vice Chancellor for Finance and Administration." This confusion led Dr. Owino to ask the University's Conflict of Interest Committee to investigate Plaintiff's relationship with E&G Associates, which identified a conflict and clarified expectations for the future.

####      vi.      Reappointment for the 2015–2016 Academic Year

On December 1, 2014, Dr. Wigal informed Dr. Owino that the Rank and Tenure Committee voted 5–0 in favor of Plaintiff's reappointment for the 2015–2016 academic year. Dr. Wigal's memorandum states that Plaintiff's achievements were consistent with committee guidelines and showed potential for continuing contributions to the College.

That same day, Dr. Owino wrote a memorandum to Interim Dean Alp concurring in the committee's recommendation. After highlighting that Plaintiff had written two major grants and made valuable local industry contacts, he expressed concerns about Plaintiff's student teaching evaluations. He noted that "[s]ome of the evaluations are satisfactory and others are below acceptable levels." Additionally, Dr. Owino wrote that another area of concern is Plaintiff's intervention on behalf of the education of his sons, and pointed out that Plaintiff had on two occasions asked him to intervene in his sons' education.

On December 2, 2014, Interim Dean Alp wrote to Provost Ainsworth additionally recommending Plaintiff's reappointment. She also noted that Plaintiff needed some improvement in his teaching evaluations and needed to minimize intervening in his children's education. Interim Dean Alp on December 15, 2014, wrote to Plaintiff congratulating him on his reappointment but also mentioned the same concerns.

####      vii.      Application for Early Tenure and Promotion

In February 2015, Plaintiff applied for tenure and promotion to Full Professor. This surprised Interim Dean Alp and Dr. Owino because Plaintiff had been at the University for less than two years, and his probationary period was originally supposed to be six years. Interim Dean Alp stated that she could not "recall another instance . . . when a faculty member applied for tenure with so much additional probationary time available." Additionally, Plaintiff's application

surprised her because Dr. Owino had already identified some deficiencies in his performance. Dr. Owino expressed the same surprises. Plaintiff, however, contends that he was offered as short as a three-year probationary period during the hiring process and that Dr. Owino had discussed with him several times the possibility of early tenure and promotion.

On March 16, 2015, Dr. Wigal informed Dr. Owino that the Rank and Tenure Committee voted 0–5 against granting Plaintiff tenure. Dr. Owino, on the same day, wrote to Interim Dean Alp concurring in the Committee's recommendation. He noted the brevity of Plaintiff's employment at the University and his limited teaching experience before joining the University. Dr. Owino also mentioned that Plaintiff's teaching evaluations for the 2013–2014 academic year were "average" and while his ratings improved in the Fall of 2014, "an improvement of one semester is not enough" to grant tenure.

Also on March 16, 2015, Dr. Wigal wrote to Dr. Owino informing him of the Committee's vote 3–1–0 to recommend promoting Plaintiff to Full Professor. The same day Dr. Owino wrote to Interim Dean Alp recommending denying the promotion. He highlighted that the Faculty Handbook states that faculty members generally serve a minimum of five years as an associate professor. Dr. Owino also noted the same deficiencies outlined in his recommendation that tenure be denied. Interim Dean Alp, Provost Ainsworth, and Chancellor Steve Angle concurred in denying Plaintiff promotion to Full Professor.

### viii. Spring 2015 Sexual Harassment Complaint

On April 22, 2015, Plaintiff emailed Samuel and Dan Webb, the University's Human Resources Director, and copied two local attorneys to the email. While the email is not in the record, Plaintiff characterizes it as a sexual harassment complaint.

The basis of the complaint was that Plaintiff made a purchase request on March 5, 2015, for Citric Acid. Faculty purchase requests are made through the College's Technical Support Office. Karl Fletcher was the manager of the office and personally reviewed all purchasing decisions within the College. The supplies were purchased from a company called Sigma-Aldrich and delivered via FedEx on March 24, 2015. The order was addressed to "Dr. Penis," University of Tennessee – Chattanooga, Tech Support. Plaintiff did not know of the delivery until a student informed him of it around April 7, 2015. Plaintiff states that he was humiliated by the event and that it "was a vindictive and retaliatory act" by the University "for opposing discriminatory acts being taken against [Dr.] Wigal[.]"

Samuel investigated the matter and interviewed Plaintiff, Fletcher, Interim Dean Alp, other University officials, and officials at Sigma-Aldrich. Fletcher adamantly denied knowledge of the incident, [*id.*], and stated that he "assumed it was an auto-correct error or an error by the vendor." He also admitted to approving the purchase and assumed responsibility. While the investigation into the package was ongoing, Plaintiff made another complaint to the Office of Equity and Diversity alleging that Fletcher retaliated against him by refusing to order a "clone computer." Fletcher stated that he was concerned about the compatibility of the computer because it was unlike any other computers at the college. He evidently offered to purchase a Dell computer that was equally powerful, configured identically, was compatible with the College's technology infrastructure, and was less expensive.

On October 14, 2015, Samuel completed both investigations. He concluded that the mislabeled package violated the University Code of Conduct and the University's Policy on Sexual Harassment. Fletcher was required to attend a sexual harassment training class, which he

completed. Samuel also found that Plaintiff had the right to order the computer, but also found that Fletcher did not retaliate in refusing to order it. Plaintiff ultimately received the computer.

While Samuel conducted the other investigations, Plaintiff made another complaint on August 18, 2015, alleging that Interim Dean Alp and Dr. Owino retaliated against him for his sexual harassment complaint against Fletcher. Plaintiff alleged that (1) they refused to assign Plaintiff his full teaching load until one week before the beginning of the academic year; (2) approached another faculty member about replacing Plaintiff as an advisor for a student program; (3) "appeared" to have made misrepresentations to the Conflict of Interest Committee in connection with Plaintiff's affiliation with E&G Associates; (4) Dr. Owino required Plaintiff to make formal requests to use laboratory equipment when no such requests are required; and (5) Fletcher delayed Plaintiff's order of computer parts, although Dr. Owino and Interim Dean Alp both approved of the order.

Samuel investigated these complaints as well. He found no support for retaliation by Dr. Owino. Samuel did find, however, "one minor instance of misconduct." On August 26, 2015, Samuel sent Dr. Owino a letter regarding the investigation. Dr. Owino posted this letter on his office door, where it remained for about 30 minutes until Samuel was notified and removed it. Samuel recommended to Provost Ainsworth that the posting of the letter by Dr. Owino violated the University's Code of Conduct and its Equal Employment Opportunity policy. Provost Ainsworth imposed a sanction of mandatory compliance training. Samuel found no evidence of retaliation by Interim Dean Alp. Provost Ainsworth agreed with Samuel that there was no evidence of retaliation by either Interim Dean Alp or Dr. Owino.

Plaintiff appealed both of Provost Ainsworth's decisions to Chancellor Angle. Angle concurred with Ainsworth, and Plaintiff then appealed to Joe DiPietro, President of the University of Tennessee. President DiPietro also concurred.

In 2017, Justin Worley, a student-employee who previously worked in Technical Support Office, admitted to mislabeling the package. Worley indicated that he had written the misnomer as a joke, with no sexual connotation whatsoever. He expected the Technical Support Office to find the error before Plaintiff received the package.

### ix. Faculty Evaluation for the 2014–2015 Academic Year

For the 2014–2015 academic year, Plaintiff received a "meets expectations" rank. Dr. Owino noted that Plaintiff met objectives successfully for that academic year and that his student reviews had improved from the previous academic year. The evaluation also states, however, that despite being advised to post his office hours, Plaintiff had not done so, and several students mentioned they could not access him during office hours. Additionally, it states that Plaintiff was absent from several classes and that he did not inform Dr. Owino of such absences. Plaintiff met research and scholarly expectations.

### x. Student Evaluations for Spring 2015 and Fall 2015

Owino on March 3, 2016, wrote a memorandum documenting Plaintiff's student evaluations for Spring 2015 and Fall 2015. He noted that "[s]tudents consistently complained about [the] lack of timely feedback on assignments and exams[,]" and that Plaintiff received "as low as 2.15 out of 7 for the question on the timely feedback of assignments and exams." Students also stated that Plaintiff was "not normally present during laboratory periods to answer questions." [*Id.*] Dr. Owino wrote that after reviewing course folders, he noticed that graded work was not returned to students, and that the course folders contained students' original work. He noted that

these comments were nearly identical to comments shared with Plaintiff during the previous reappointment cycle, which made it apparent that Plaintiff did not adequately address Owino's previous comments.

### xi.  Faculty Evaluation for the 2015–2016 Academic Year

Plaintiff's faculty evaluation for the 2015–2016 academic year stated that his "teaching evaluations are low and not improving."  It noted that "students are dissatisfied" with Plaintiff's lack of timely feedback on assignments and tests and that his course folders were incomplete, suggesting that he compiled them in a hurry.  The form further states that Plaintiff's proposal submission and grant securing was inadequate for rank and status as a probationary faculty member, but that he secured a $75,000 grant with others.  Additionally, the form notes that Plaintiff did not participate in a self-study report, despite being continually asked by Dr. Frank Jones, and another faculty member thus performed the task.  Plaintiff attended "2 out of 9 meetings on the University Curriculum committee and 5 out of 7 meetings as the college senate representative."  Ultimately, Plaintiff received a rating of "Needs Improvement[.]"  Plaintiff and Dr. Owino signed this document in April 2016.

### xii.  Final Reappointment for 2016–2017 Academic Year

On February 25, 2016, Dr. Frank Jones notified Owino that the Rank and Tenure Committee voted 2–3–1 against recommending Plaintiff for reappointment for the 2016–2017 academic year.  Dr. Jones stated that the committee felt that Plaintiff's "teaching ratings were low and not improving.  Also, his research was not progressing in a manner commensurate with rank."

Dr. Wigal, who served on the committee, stated that during the reappointment discussions, the committee "engaged in a very unusual discussion and undertook an unusual process."  She stated that the addition of Dr. Mike Jones to the Committee was unusual because that made the

total number of members of the Committee six, as opposed to five in previous years. During the meeting, Dr. Wigal said that there was "negative discussion" about Plaintiff's complaint with the Office of Equity and Diversity. Dr. Mike Jones evidently referred to that as "suing the university" and that they "should not want someone at [the University] who had sued it in the past" because "that does not look good." Dr. Mike Jones evidently brought it up again later in the meeting and said to Dr. Wigal, "what, do you have a lawsuit also?" Dr. Wigal stated that she thought Plaintiff met all requirements for reappointment and that it was unusual for a professor to be terminated prior to the end of a tenure track, "except in very unusual circumstances."

Dr. Owino notified Dean Pack on March 3, 2016, that he concurred in the committee's recommendation.[2] He noted that Plaintiff's "student teaching evaluations are not improving, and recurring student complaints about the lack of timely feedback on homework assignments and exams make it evident that teaching is not his top priority." Dean Pack informed Provost Ainsworth on March 7, 2016, that, based on his "independent evaluation of [Plaintiff's] teaching, research, and service activities," he concurred with the recommendation to not reappoint Plaintiff for the 2016–2017 academic year. Dean Pack noted that it was "especially troubling to find that course assignments are not returned to students in a timely manner or not returned at all for some of the courses he taught." He further stated that "[t]his deficiency was pointed out in the past[.]" On the same day, Dean Pack notified Plaintiff of his decision.

On March 21, 2016, Provost Ainsworth sent a memo to Plaintiff informing him that he was not recommending reappointment to Chancellor Angle. He wrote that "a lack of evidence indicating that [Plaintiff had] appropriately addressed classroom and student concerns" formed the basis of this decision. Provost Ainsworth again, on April 5, 2016, informed Plaintiff that his

---

[2] Dean Pack began serving as Dean of the College in January 2016.

terminal appointment would be the 2016–2017 academic year.  Dean Pack, "[b]ased on the volume and magnitude of issues with [Plaintiff's] teaching," recommended to Provost Ainsworth that Plaintiff not teach any classes during his terminal year.

## II.  Procedural History

Plaintiff filed his complaint on March 15, 2017.  On May 2, 2019, the University filed a Motion to Compel because Plaintiff had failed to respond to discovery requests served over a year earlier.  The University filed a Motion to Dismiss after Plaintiff refused to attend a deposition.  On August 20, 2019, the University filed a Motion for Summary Judgment, providing declarations and exhibits.  Plaintiff responded, relying on his own declaration and that of Dr. Cecilia Wigal.

On October 28, 2019, the district court entered an Order granting summary judgment to the University and denying as moot the University's Motion to Dismiss.  Plaintiff timely appealed.

## III.  Application of Law to Facts

We review *de novo* a district court's grant of summary judgment and view the evidence in the light most favorable to the non-moving party.  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (6th Cir. 2013).  Plaintiff claims that he was subject to a hostile work environment due to sexual harassment and that the University retaliated against him for complaining of sexual harassment, both in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*

### A.  Hostile Work Environment Claim

Plaintiff claims that he was subjected to a hostile work environment in violation of Title VII.  To establish a *prima facie* hostile work environment claim, a plaintiff must show that:

> (1) he or she was a member of a protected class; (2) he or she was subjected to unwelcome sexual harassment; (3) the harassment complained of was based on sex; (4) the charged sexual harassment created a hostile work environment; and (5) the employer is liable.

*Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 307 (6th Cir. 2016).

A reasonable factfinder could find that the "Dr. Penis" moniker on the mislabeled package was based on Plaintiff's gender. The student-employee who mislabeled the package stated that there was no sexual connotation whatsoever. In fact, Samuel found that this incident violated the University Code of Conduct and the University's Policy on Sexual Harassment. Fletcher was required to undergo sexual harassment training.

Plaintiff cannot, however, show that the act created a hostile work environment. A hostile work environment "is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Smith*, 813 F.3d at 309 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)). We must consider "all the circumstances" which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Plaintiff maintains that an isolated act of discrimination can create a hostile work environment. The cases plaintiff cites, however, remind us that for a lone incident to do so, it must be "extremely serious[.]" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see Adams v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1254 (11th Cir. 2014) (supervisor carving racial slur into a wall at the workplace); *Ayissi-Etoh*, 712 F.3d at 577 (use of an "offensive racial epithet" by a supervisor while yelling at a subordinate); *Rodgers v. Western-Southern Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) (use of the "n-word" by a supervisor in the presence of subordinates). The single incident here is not "extremely serious" such that it created a hostile work environment. To the extent Plaintiff briefly argues that the Wi-Fi network named "Dr. P. Ennis"[3] in the Hamilton

---

[3] Plaintiff's briefings consistently refer to the Wi-Fi network as "Dr. Penis," but his declaration indicates the network was named "Dr. P. Ennis."

County Business Development Center is further evidence to support his claim, he admits that the Business Development Center is not owned or operated by the University. Plaintiff also does not provide evidence of when the Wi-Fi network was created. He states only that he learned of it in August 2016 and that it may have been created by an employee of the University, but that the network was tied to the employee's private business which Plaintiff claims he maintained while employed by the University.

Because Plaintiff cannot show that the harassment complained of created a hostile work environment, the University is entitled to summary judgment on this claim.

### B. Retaliation Claim

Plaintiff also alleges that the University retaliated against him for complaining of sexual harassment, also in violation of Title VII.[4] "A plaintiff 'may prove unlawful retaliation by presenting direct evidence of such retaliation or by establishing a *prima facie* case under the *McDonnell Douglas* framework.'" *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013) (quoting *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003)). Plaintiff attempts the latter, and thus must demonstrate that:

> (1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.

*Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007)) (internal quotation marks omitted). We have consistently held that this is not an onerous burden. *See, e.g.*, *Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

---

[4] "It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made . . . unlawful . . . by this subchapter." 42 U.S.C. § 2000e-3(a).

If the plaintiff establishes a *prima facie* case of retaliation, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the materially adverse action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2009). If the defendant does so, the burden shifts back to the plaintiff to show the reasons given were a pretext for retaliation. *Id.* at 614.

The parties do not dispute that Plaintiff engaged in protected activity when he complained to the Office of Equity and Diversity on April 22, 2015, about the mislabeled package. The parties disagree, however, on the protected nature of Plaintiff's alleged complaints of gender discrimination concerning Dr. Wigal.

A plaintiff's objection to an employment practice is protected if the plaintiff's supervisors "should have reasonably understood" that the plaintiff was making a complaint of discrimination. *See Mumm v. Charter Twp. of Superior*, 727 F. App'x 110, 112 (6th Cir. 2018) (quoting *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 512 (6th Cir. 2016)). The "complaint must allege unlawful discrimination rather than general unfairness." *Id.* A complaint need not be "'lodged with absolute formality, clarity, or precision," but a "vague charge of discrimination is insufficient[.]'" *Id.* at 112–13 (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015); *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989)).

The evidence shows that none of Plaintiff's superiors should have reasonably understood that he was complaining of gender discrimination against Dr. Wigal regarding the elimination of the general engineering program. The excerpt from the interview between Samuel and Plaintiff, quoted above, shows that Plaintiff expressed concerns about the process by which the College was handling the potential elimination of the program. Indeed, Plaintiff stated: "What I'm more

concerned about is the appropriate process[es] weren't involved." Samuel stated that Plaintiff never mentioned in his multiple interviews that he thought the University was discriminating against Dr. Wigal because of her gender. Additionally, in response to Dr. Wigal's complaint, Samuel interviewed five potential witnesses. None of them named Plaintiff as a corroborating witness, including Dr. Wigal. Plaintiff states that he specifically discussed "the discrimination and retaliation [he] felt was being directed at Dr. Wigal" but does not indicate to whom he spoke. At most, Plaintiff made a charge of "general unfairness" in the proposed elimination of the program. *See Mumm*, 727 F. App'x at 112. Accordingly, we will consider only the alleged retaliatory acts after Plaintiff complained of the mislabeled package.

Plaintiff made the complaint regarding the mislabeled package on April 22, 2015. The University knew of this complaint, as Plaintiff complained through an email to Samuel. Plaintiff maintains the University took several retaliatory acts against him following this April 2015 complaint. He asserts that (1) he was delayed access to start-up funds, initially denied required equipment, and was refused a computing platform; (2) he received his class schedule for the Fall 2015 semester one week before the semester began; (3) Dr. Owino harassed Plaintiff's son and accused him of stealing credit card information; (4) Dr. Owino "removed" Plaintiff as an advisor to a student program; (5) Dr. Owino asked Human Resources to investigate E&G consulting equipment and Plaintiff's relationship with the firm and the Fall 2014 workshop; (6) the Office of Audit and Compliance conducted an audit into Plaintiff's teaching performance; and (7) the Rank and Tenure Committee's vote against Plaintiff's reappointment.

The issue about the start-up funds was discussed in an August 26, 2015 meeting among Plaintiff, Interim Dean Alp, and Fletcher. Both Interim Dean Alp and Dr. Owino stated that they understood that Plaintiff was to receive $15,000. Plaintiff, however, produced a letter indicating

that he was entitled to $35,000. Interim Dean Alp and Dr. Owino noted that this letter was not in the files of the College or the Office of Faculty Records, but that after conversations with campus leadership, they awarded Plaintiff the full $35,000.

As for Plaintiff's class schedule, Alp stated that scheduling was not up to her as the Interim Dean, but that it is under the Department Head, Dr. Owino. Both Interim Dean Alp and Dr. Owino noted that the Fall 2015 schedule presented unusual difficulties because one professor announced that she was taking a one-year leave of absence for the 2015–2016 academic year. Another professor was diagnosed with an illness that required extended medical leave. Because of this, the Department was having trouble determining how to cover the Chemical Engineering courses with one full-time professor, Plaintiff, and one visiting professor, Dr. Harris, who was promoted to full-time professor because of these problems. Interim Dean Alp and Dr. Owino stated that Plaintiff was assigned one additional short course shortly before the semester, but other than that, Plaintiff and all other faculty were aware of their schedules several months earlier. Dr. Owino noted that he prefers to schedule classes as far in advance as possible, but that he has on "several occasions had to add courses to faculty members' schedules at the last minute in order to ensure coverage." He added that he has "personally taught courses with only a few days' notice when circumstances require it."

Plaintiff maintains that in late April and early May 2015, Dr. Owino harassed his son, a student at the time, regarding a purchase charged to a credit card of the University. Dr. Owino, however, did not learn of Plaintiff's retaliation complaint against him until August 26, 2015. And it was not until September 8, 2015, when Samuel interviewed Dr. Owino, that Dr. Owino stated that he learned of Plaintiff's complaint against Fletcher.

Plaintiff alleges that Dr. Owino retaliated against him by "removing" him from advisor of "Chem-e-Car," an extracurricular activity sponsored by the Department. Owino stated that in the summer of 2015, he simply asked Dr. Harris if he was interested in serving as the Chem-e-Car advisor because he was new to the faculty. He noted that he never spoke to Plaintiff about this, but that Plaintiff remained the advisor. In any event, it appears that Dr. Owino approached Dr. Harris about this opportunity before knowing of Plaintiff's complaints, and Plaintiff remained the Chem-e-Car advisor.

Plaintiff says that Dr. Owino requested the Human Resources Department to investigate his E&G activities and the Fall 2014 workshop. He alleges that Dr. Owino did so in both 2014 and 2015. Dr. Owino was concerned with Plaintiff's role with E&G after the workshop because of the lack of involvement by the University in planning the event, and Plaintiff marketing the workshop as a joint event between the University and E&G. Dr. Owino asked the Conflict of Interest Committee to investigate Plaintiff's relationship with the firm, and the committee identified a conflict of interest and clarified expectations about any future workshops. This appears to have occurred during the Fall 2014 semester, before Plaintiff ever filed his initial complaint. Regarding the 2015 investigation, Dr. Owino noticed on November 10, 2015, that someone was in Plaintiff's laboratory. This concerned him because Plaintiff and his students were out of town. He found one of Plaintiff's sons in the laboratory, who said he was conducting an experiment for Plaintiff. In an email to Plaintiff that same day, Dr. Owino expressed concerns that his son was not a student at the University and raised liability concerns if Plaintiff's son or another unauthorized person were injured while on University premises. He also noted that Plaintiff had yet to complete loan agreement forms for the equipment.

The Office of Audit and Compliance conducted an audit into Plaintiff's teaching performance following poor student reviews about Plaintiff's teaching. Although the date of this request is not clear, it appears to have been made in relation to Dr. Owino's November 21, 2014 review of Plaintiff's student evaluations.[5] He stated he "ordinarily" requests the Office of Audit and Compliance to elicit feedback from students following low teaching evaluations. Indeed, following the audit request, on December 1, 2014, Dr. Owino concurred with the Rank and Tenure Committee's recommendation to reappoint Plaintiff for the 2015–2016 academic year.

Lastly, Plaintiff maintains that the University retaliated against him by the Rank and Tenure Committee voting against his reappointment for the 2016–2017 academic year. The Committee's vote against Plaintiff's reappointment—which led to his termination—is sufficient to establish a materially adverse action. Plaintiff has thus shown that he engaged in a protected activity that the University knew of, and has established a materially adverse action. Plaintiff, however, fails to make a *prima facie* case of retaliation because he cannot establish causation.

"The Supreme Court has made clear that Title VII retaliation claims require traditional but-for causation" such that a "plaintiff must show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct." *Redlin*, 921 F.3d at 614–15 (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013)). "Thus, a defendant will be entitled to summary judgment 'so long as nondiscriminatory factors were sufficient to justify its ultimate decision.'" *Id.* at 615 (quoting *Seoane-Vasquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014)) (alterations omitted).

---

[5] The Office of Audit and Compliance, however, appears to not have sent Dr. Owino student feedback from the audit until February 29, 2016, and March 7, 2016. This occurred after the Rank and Tenure Committee voted against reappointing Plaintiff on February 25, 2016, but the first feedback from the audit was sent to Dr. Owino before he informed Dean Pack on March 3, 2016, that he concurred in the Committee's decision. Thus, part of the audit feedback may well have informed Dr. Owino's decision to concur. And in any event, the Rank and Tenure Committee and other decision-makers were aware that Plaintiff had received poor student evaluations prior to those found by the audit.

The vote against reappointing Plaintiff occurred in February 2016, about 10 months after Plaintiff's initial complaint and six months after his retaliation complaint. *Id.* at 615 ("Where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.") (alterations omitted). Dr. Wigal's mention of the unusual structure of the Rank and Tenure Committee and the conversations about Plaintiff's complaint indicate that Plaintiff's protected activity may have been a motivating factor in at least one vote against reappointing Plaintiff for the 2016–2017 academic year. But the University first observed deficiencies in Plaintiff's teaching performance in the Spring 2014 semester. The University communicated these concerns to Plaintiff when it reappointed him to the 2015–2016 academic year. In denying Plaintiff early tenure, Dr. Owino noted that, while some of these deficiencies improved during the Fall 2014 semester, an improvement of one semester did not suffice to grant tenure. The bases for denying Plaintiff promotion to Full Professor consisted of similar reasons, and that occurred in March 2015, before Plaintiff filed his initial complaint. In addition, the improvements in Plaintiff's teaching evaluations did not remain, as Dr. Owino noted that Plaintiff's evaluations had again declined—and had worsened—when Dr. Owino recommended against reappointing Plaintiff for the 2016–2017 academic year. Because Plaintiff cannot show that but for his complaints about the mislabeled package and retaliation, he would have been reappointed for the 2016–2017 academic year, he fails to establish a *prima facie* case of retaliation.

After the Rank and Tenure Committee and Dr. Owino recommended against reappointing Plaintiff, Dean Pack conducted an "independent review" of Plaintiff's record. In an email to Plaintiff informing him of this recommendation, Dean Pack stated that "[i]t is especially troubling

to find that course assignments are not returned to the students in a timely manner or not returned at all for some of the courses [Plaintiff] taught" because "[t]his deficiency was pointed out in the past as an area that needed to be rectified." Dean Pack also listed numerous other concerns that he had about Plaintiff's performance in his affidavit for this case, which included several complaints from students about Plaintiff's teaching, Plaintiff's violations of FERPA, and Plaintiff's attempts to persuade Dean Pack to support a project behind the backs of Chancellor Angle and Interim Dean Alp, who had decided not to pursue the project. After Dean Pack concluded his review, Provost Ainsworth "careful[ly] evaluat[ed]" Plaintiff's record and recommended that the University not re-hire Plaintiff because of "a lack of evidence indicating that [Plaintiff had] appropriately addressed classroom and student concerns." Plaintiff does not assert that Dean Pack or Provost Ainsworth harbored any discriminatory animus against him. Only after these independent reviews had been conducted did Chancellor Angle conduct his own review and decide that the University would not reappoint Plaintiff.

Plaintiff also does not claim that Chancellor Angle harbored any animus against him. And although he claims the recommendations of the Rank and Tenure Committee and Dr. Owino influenced Chancellor Angle's decision, he produces no evidence that Chancellor Angle's decision was not entirely independent, based on the entire record before him, and entirely justified by various reviews independent of the allegedly biased decisions of the Rank and Tenure Committee and Dr. Owino. The University is thus entitled to summary judgment on this claim as well.

### IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court.